Nadine **LOUIS**, by her mother and natural guardian, May Louis, and West Philadelphia Branch, National Association for the Advancement of Colored People, on behalf of themselves and all others similarly situated,

v.

The **PENNSYLVANIA INDUSTRIAL DEVELOPMENT AUTHORITY** et al.

Civ. A. No. 72–774.

United States District Court, E. D. Pennsylvania.

Jan. 18, 1974.

Harold I. Goodman, George D. Gould, Jonathan M. Stein, Community Legal Services, Inc., Philadelphia, Pa., Edwin D. Wolf, Lawyers Committee for Civil Rights Under Law, Philadelphia, Pa., for plaintiffs.

Thomas L. Snyder, James T. Collie, Jr., Ruffin, Hazlett, Perry & Lonergan, Pittsburgh, Pa., for PIDA.

J. Robert Twombly of Fronefield, deFuria & Petrikin, Media, Pa., for DCIDC.

Francis E. Shields, Pepper, Hamilton & Scheetz, Philadelphia, Pa., for Chilton.

## OPINION

DITTER, District Judge.

This civil rights action was brought to force Pennsylvania to develop standards

to judge whether there is discrimination against Blacks by companies which apply for state aid. The matter comes before the Court for decision after a consolidated hearing on plaintiffs' motion for a preliminary injunction and a full hearing on the merits of the complaint pursuant to Federal Rule of Civil Procedure 65(a)(2).

The plaintiffs are seven individuals and the West Philadelphia Branch, National Association for the Advancement of Colored People. Named as defendants are the Pennsylvania Industrial Development Authority (PIDA), the Delaware County Industrial Development Corporation (DCIDC), and the Chilton Company, an industrial firm with its principal place of business in Philadelphia. That part of the case presently before me for decision is the allegation that PIDA and DCIDC are violating the Civil Rights Acts of 1866 and 1871, 42 U.S.C. §§ 1981 and 1983, and the Fourteenth Amendment to the United States Constitution by failing to consider whether business enterprises receiving PIDA loans are unlawfully and unconstitutionally discriminating against minorities. Plaintiffs seek to enjoin permanently PIDA and DCIDC from processing, approving, and granting loans until such time as said defendants develop criteria and procedures to determine whether applicants for their loans are discriminating against minorities.

## I. BACKGROUND

Since 1956, Pennsylvania has underwritten a statutory program [1] designed to attract and keep industry within its borders. As the administering office, PIDA makes loans, through local industrial development agencies such as DCIDC, to companies which locate in critical economic areas. PIDA can loan 40 or 45% of the cost of a project (depending on the type of project) at a very low rate of interest. There is no provision in the statute for investigating whether or not a benefiting company discriminates against minorities in employment. PIDA has not instituted any such investigatory process, there is no provision in its budget for such a procedure, and there have been no complaints to PIDA that any of the loan recipients discriminated against minorities. Nevertheless, there is an anti-discrimination clause in the closing documents for all PIDA loans.[2] There have been no defaults under these provisions.

During June and July of 1971, DCIDC applied to PIDA for $4,080,000 to help finance the construction of new facilities for the Chilton Company in Radnor Township, Delaware County.[3] Chilton, primarily a publisher, printer and mar-

---

1. See Pennsylvania Industrial Development Authority Act, 73 P.S. § 301 et seq.

2. In granting loans, PIDA sets forth in its commitment letter:
 "A condition of the disbursement of the loan is that there shall be no discrimination against any employee in establishing the project, or against any applicant for project employment because of race, religion, color, national origin, sex or age. This provision shall include, but not be limited to the following: employment, upgrading, demotion or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship . . . You shall cause these provisions, or ones similar thereto, to be inserted in all project contracts."
 This non-discrimination paragraph has been included in PIDA's commitment papers since December of 1971 or January of 1972,

at the request of the Governor's office (N.T. p. 111, 5/11/72, and Defendants' Exhibits 5, 6, and 7).
The above conditions relating to non-discrimination must be certified to by benefiting companies and included in closing documents, or no funds from PIDA would be available (N.T. p. 128, 5/10/72; Defendants' Exhibits 5, 6, and 7).

3. On June 23, 1971, DCIDC made an initial application to PIDA for $2,600,000 to partially finance construction of new facilities for Chilton. This application was denied because PIDA felt Chilton was merely relocating part of its operation within the state. Aiding a company to move within the state is not considered part of PIDA's task of keeping and attracting industry. See 73 P.S. § 307(k). Such a proposal would involve the state in redistributing jobs within the Commonwealth, to the detriment of the losing area.

ket researcher, is a Delaware corporation with its principal offices at 56th and Chestnut Streets, Philadelphia. It also has facilities at 401 Walnut Street, Philadelphia, and One Decker Square, Bala Cynwyd, as well as an office in Pittsburgh. At the time of this suit, Chilton employed 1115 people at 56th and Chestnut, of which 17.5% were black; 305 employees at One Decker Square, of which about 1.6% were black, and 60 employees at its offices at 401 Walnut, of which about 10% were black.[4] Chilton had been seriously considering moving its operations to the State of Delaware. Had it done so, approximately 1500 jobs would have been lost to the Philadelphia area. The purpose of the PIDA loan was to provide an incentive to keep Chilton from leaving the Commonwealth. PIDA tentatively confirmed its loan to Chilton in August, 1971, and finally approved it, December, 1971, or January, 1972.[5]

On April 20, 1972, this suit was filed, seeking to stop the Chilton loan, as well as all other PIDA loans. Plaintiffs contend first that by failing to consider whether businesses receiving PIDA loans are discriminating against Blacks, PIDA and DCIDC are violating 42 U.S. C. §§ 1981, 1983, and the Fourteenth Amendment to the United States Constitution. Second, plaintiffs allege that Chilton discriminates against Blacks in its employment practices, and in its attempt to relocate its offices outside of Philadelphia, in violation of 42 U.S.C. § 1981. Third, plaintiffs contend that PIDA and DCIDC fostered and promoted the discrimination practiced by Chilton by processing and approving its loan application in violation of 42 U.S.C. §§ 1981, and 1983 and the Fourteenth Amendment. Finally, plaintiffs contend that all of the defendants have violated the Thirteenth Amendment.

To correct these wrongs, plaintiffs sought a declaratory judgment declaring the alleged discriminatory acts of all defendants to be in violation of the law; temporary and permanent injunctive relief enjoining the Chilton loan; permanent injunctive relief preventing PIDA and DCIDC from making any loans until standards and procedures are set up to determine whether applicants for loans are discriminating against minorities; an injunction against discrimination aimed at Blacks allegedly practiced by Chilton; a requirement that Chilton adopt an affirmative action plan; and a requirement that Chilton employ plaintiff, Nadine Louis.

At this time the only issue before me is whether PIDA must develop criteria and procedures to determine whether applicants for loans are discriminating against minorities.[6] By informal agreement among counsel, all other issues involving PIDA, DCIDC and Chilton have been tentatively resolved. This settlement will become final after a decision concerning PIDA's standards. However, all parties agree that this tentative settlement is not to affect plaintiffs' standing.

## II. THE PLAINTIFFS

The threshold question in this case concerns the plaintiffs, their allegations, and their proofs.

The concept of standing requires that plaintiffs demonstrate that they have been injured. Here the NAACP, appearing as an organization seeking to represent its members, alleges a long history of concern in racial and civil rights problems, and claims a "direct and immediate interest in eliminating discrimination."[7] These averments were expanded to recite the NAACP's advice and assistance to unemployed

---

4. These figures and percentages were taken from paragraph 21 of Chilton's answer and plaintiffs' exhibit 9—Equal Employment Opportunity, Employer Information Report EEO–1, dated April 29, 1971.

5. N.T. pp. 133–34, May 10, 1972.

6. All counsel have represented to me that the record is complete on this issue, as to both preliminary and final relief.

7. Complaint, paragraph 32.

members seeking work.[8] In addition, the intervenor plaintiffs allege that this organization is a source of aid and advice to those seeking jobs. However, despite interest and history, there is no allegation of injury to the NAACP or its members. The record is barren of evidence that any member was ever denied employment at Chilton. Since there is neither allegation nor proof that a single member has been injured, NAACP v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L. Ed.2d 405 (1963) is not in point. In order to represent its members, an organization must allege harm or injury to them. The NAACP stands in the same position as did the Sierra Club in Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). It has no personal stake in the controversy, and thus lacks the required standing to be a plaintiff here. Id. at 730, 92 S.Ct. at 1364–1369.

■ Plaintiff, Nadine Louis, did not appear as a witness at the hearings in this case, but her testimony was received through deposition. On August 5, 1970, while a 17 year old junior in high school, Miss Louis handed a job application form to a security guard at the Chilton plant. Although the guards are not Chilton employees, her application for employment in the research department was delivered to the personnel office. The form indicated that the plaintiff expected to graduate from high school in 1971, and the application was therefore deemed to be one for either temporary summer work or for part-time work after school. Since neither type of employee was being hired at that time, the form was placed with the part-time applications. In the event that a need for part-time employees arose during the next three months, her application, along with any others received during that period, would have been available to the personnel department.

Several weeks later, Miss Louis stated that she placed a telephone call to Chilton. While waiting for the switchboard to connect her with the personnel office, she was apparently disconnected. She made no further attempt to contact the defendant. She did not call again, come to Chilton for an interview, write, or in any other manner make any inquiry as to the status of her application. Chilton sent no letter to Miss Louis, but apparently treated her application in accordance with the standard policy of the company, which necessitated not acknowledging the large number of unsolicited applications unless and until a job opening existed. Nothing more was heard from or regarding Nadine Louis or her application until April 20, 1972, when the instant civil rights action was filed. Her entire assertion that Chilton discriminates against Blacks, and thus the foundation for this action, is based on the events just related. The illogic and tenuity of this argument is readily apparent. No possible interpretation of the above facts would allow a finding that Nadine Louis was the victim of discrimination by Chilton.

Two petitions were presented both during and after the hearings in this case to allow six additional persons to intervene as party plaintiffs. I granted both requests.

■ In their petitions the intervenor plaintiffs alleged that they were either fired or not hired because they were Black. No evidence was presented at the hearings, nor has anyone asked for additional opportunity to present facts to substantiate these claims. Mere allegations are not sufficient to support a claim for relief. Thus, the intervenors add nothing to this case.

■ In short, there has been no proof that Chilton discriminated against any of the plaintiffs.[9] In the absence of a

---

8. Amended complaint, paragraphs 32(a) and 32(b).

9. Plaintiffs' counsel did not assert that there was evidence of injury to any plaintiff, but

contended that none was required. In counsel's view, it is sufficient if there is an allegation of "injury in fact," a term found in cases brought under the judicial review provisions of Administrative Procedure Act, 5

personal stake in the outcome of the controversy, there is no Article III jurisdiction: Flast v. Cohen, 392 U.S. 98, 101, 88 S.Ct. 1942, 1953, 20 L.Ed.2d 947 (1968). See also O'Shea v. Littleton, 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974).

As the Supreme Court has recently said, "In *Sierra Club*[10] though we went on to stress the importance of demonstrating that the party seeking review be himself among the injured, for it is this requirement that gives a litigant a direct stake in the controversy and prevents the judicial process from becoming no more than a vehicle for the vindication of the value interests of concerned bystanders." United States v. Students Challenging Regulatory Agency Procedures (SCRAP), 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973).

While a party may seek redress for injury to himself, he may not bring an action for injury done to others: Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 92 S.Ct. 1965, 1968, 32 L.Ed.2d 627 (1972). In the absence of an injured party, no decision on the merits can be made. *Id.* at 407 U.S. 164, 92 S. Ct. 1967. See also Ray Barllie Trash Hauling, Inc. v. Kleppe, 477 F.2d 696 (5th Cir. 1973), and York-Shipley, Inc. v. Atlantic Mutual Insurance Company, 474 F.2d 8 (5th Cir. 1973).

## III. PLAINTIFFS' CONTENTION AND STATISTICS

Although a decision on the merits is precluded because plaintiffs have suffered no injury, a consideration of their principal assertion reveals they have shown nothing which would warrant the relief they seek against PIDA.

Plaintiffs have alleged that Chilton discriminates against Blacks. Plaintiffs then assert that the Commonwealth

of Pennsylvania may not be a joint participant in private discrimination against Blacks. I agree with this abstract proposition for the reasons set forth in Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961), and Simkins v. Moses H. Cone Memorial Hospital, 323 F.2d 959 (4th Cir. 1963), cert. denied, 376 U. S. 938, 84 S.Ct. 793, 11 L.Ed.2d 659 (1964).

Plaintiffs go further, however, and contend whether or not they have shown discrimination on Chilton's part, all PIDA loans, including Chilton's,[11] must be halted until PIDA develops standards to detect if businesses receiving its loans discriminate. Here, I disagree.

This action was instituted to enjoin distribution of a $4,080,000. PIDA loan to Chilton, a loan for which a letter of commitment had been given several months before. Based on the assurance that the PIDA money would be available when needed, Chilton went ahead with its $10,200,000. Delaware County construction project. Work had already been started and was well underway by the time plaintiff brought suit. Enjoining the loan would stop the work and possibly force eventual abandonment of Chilton's plans. The effect on Chilton might be disastrous with the possibility that 1500 people could lose their jobs. In view of the stakes, I conclude the plaintiffs must prove private discrimination exists before the state can be enjoined, its executive branch subjected to federal control, and the seeds of economic havoc sown.

Plaintiffs contend that the rationale in Shannon v. United States Department of Housing and Urban Development; 436 F.2d 809 (3rd Cir. 1970), supports their position. In *Shannon,* the Court of Appeals held that HUD had

U.S.C. §§ 701–706, to have administrative agency decisions set aside. This is not such a case.

10. Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 1366, 31 L.Ed.2d 636 (1972).

11. The settlement reached by the parties as to Chilton does not change this contention on the part of plaintiffs. It was agreed that this settlement would not affect plaintiffs' rights.

an affirmative duty to achieve fair housing. In reaching this decision the Court stated:

> "Read together, the Housing Act of 1949 and the Civil Rights Acts of 1964 and 1968 show a progression in the thinking of Congress as to what factors significantly contributed to urban blight and what steps must be taken to reverse the trend or to prevent the recurrence of such blight. In 1949, the Secretary, in examining whether a plan presented by a LPA included a workable program for community improvement, could not act unconstitutionally, but possibly could act neutrally on the issue of racial segregation. *By 1964 he was directed, when considering whether a program of community development was workable, to look at the effects of local planning action* and to prevent discrimination in housing resulting from such action. *In 1968 he was directed to act affirmatively to achieve fair housing.* Whatever were the most significant features of a workable program for community improvement in 1949, by 1964 such a program had to be nondiscriminatory in its effects, and *by 1968 the Secretary had to affirmatively promote fair housing.*" 436 F.2d at 816 (emphasis added).

The heart of the *Shannon* decision is that HUD had not carried out the Congressional policy set forth in the Housing act of 1949 and the 1964 and 1968 Civil Rights Acts, and had failed to follow *its own* regulations. The plaintiffs argue by way of "analogy and juxtaposition, PIDA . . . cannot comply with the requirements of the Fourteenth Amendment unless it develops criteria and standards to determine if businesses receiving its loans are discriminating against Blacks." [12] The plaintiffs are trying to force the factual setting of this case into the mold formed by *Shannon*. The differences between the two are obvious. HUD is a Federal agency, with statutory, affirmative duties imposed by federal law as recognized by HUD's own regulations. PIDA has no statutory, affirmative duties relating to employment discrimination and is a state agency. While it is true that Pennsylvania may not use PIDA as an instrument of discrimination, it does not follow that the State is doing so just because these plaintiffs consider PIDA's methods to prevent private discrimination unreliable.

Plaintiffs attempted to show discrimination at Chilton by introducing statistics taken from Chilton's reports to the Equal Employment Opportunity Commission (EEOC).[13] Plaintiffs assert that because Chilton's Black employees do not equal 35% of its total employees, a ratio equivalent to the Black-White population of Philadelphia, and because there are only a small number of Blacks in the top-job categories, they have shown enough to prevail.

Plaintiffs' position is based upon the theory that *valid* statistical evidence may be used to establish a prima facie case of discrimination, thus shifting the burden of proof to the defendant to rebut any adverse inferences. However, in those cases where it was held that statistics justified a change in the burden of proof, there were great disparities in overall minority employment as compared to population. For example, in Parham v. Southwestern Bell Telephone Co., 433 F.2d 421 (8th Cir. 1970),

---

12. Plaintiffs' Memorandum of Law in Support of their Motion for a Temporary Restraining Order, page 5.

13. In plaintiffs' complaint and various other papers filed, they set forth statistics which vary from those in the EEOC Reports. However, those statistics were never substantiated, whereas the EEOC Reports were actually admitted in evidence at the hearing by the plaintiffs. Similarly, Chilton set forth different figures in its answer to the complaint (apparently just a change in personnel numbers since the EEOC report for 1971 was filed), but these were not substantiated at the hearing either.

Blacks represented only 1.82% of a work force numbering 3,074.

At Chilton, there is no comparable disparity and thus a need for evidence to show some correlation between jobs and available Black workers. Plaintiffs produced no such testimony. Instead they urge that since 35% of Philadelphia's population is Black, Chilton must be discriminating unless 35% of its employees are Black. Chilton, on the other hand, presents that which on its face seems a more reasonable argument: a comparison should be made between Chilton employees and the percentage of Blacks in the total pool of available manpower in the Standard Metropolitan Statistical Area, as established by the Bureau of Census, of which Philadelphia is a part, i. e., 18.-05%. Perhaps had a statistician testified or had there been some other evidence to show why the number of children, old people, the disabled, and all others not available to work should be ignored when evaluating the ratio between Black population and Black employees at Chilton, a different result might be possible. On the present record, however, a mere comparison between jobs and population proves nothing.[14] The same is true so far as Chilton's top-level jobs are concerned. For example, how many Blacks in the Philadelphia Standard Metropolitan Statistical Area are available to fill the highly skilled positions at Chilton such as editor, publisher, or technical writer? Quite possibly there are many Black persons with these abilities, but plaintiffs have failed to produce evidence that there are any at all. See Fiss, A Theory of Fair Employment Laws, 38 U.Chi.L.Rev. 235, 277 (1971).

While in some cases figures may be the only proof available to show deliberately concealed, racially biased policies and action, ". . . as is the case with all statistics, their use is condi-tioned by the existence of proper supportive facts and the absence of variables which would undermine the reasonableness of the inference of discrimination which is drawn." United States v. Ironworker's Local 86, 443 F.2d 544, 551 (9th Cir.), cert. denied, 404 U.S. 984, 92 S.Ct. 447, 30 L.Ed.2d 367 (1971). In a recent decision involving alleged employment discrimination by the Philadelphia police department, the Third Circuit Court of Appeals expressed its doubts over the lack of evidence about the significance of statistics and the use of "speculation" by the court in analyzing that type data. Commonwealth of Pennsylvania, et al v. O'Neill et al., 473 F.2d 1029 (3rd Cir. 1973). The comments of Chief Judge Northrop in a recent employment discrimination case, are applicable here:

"While it is true that a plaintiff may employ valid statistical evidence to establish a prima facie case of racial discrimination and thus shift the burden to the defendant to refute the inference of discrimination [citations omitted], plaintiff's use of statistics in this case falls far short of establishing a prima facie case. Here the plaintiff merely asks the Court to take judicial notice of a population percentage of questionable validity and attempts to meet her burden in this manner. Assuming that judicial notice is taken of this percentage, it does not establish a prima facie case when such a figure is compared to the percentage of blacks employed by the defendant; for plaintiff makes no effort to show the percentage of black electrical engineers, black Ph. D.'s, black draftsmen, black electrical technicians, or black secretaries in Baltimore, or to show the number of blacks that have applied with the defendant and have been rejected in each job classification. At this juncture it is not necessary to determine the quan-

14. By way of illustration: it is statistically true that there have been no forest fires on Manhattan Island since the "Smokey the Bear" advertisements have been displayed in New York subways. However, it is not commonly accepted that this statistic proves the value of advertising.

tum of statistical evidence necessary to successfully shift the burden, for it is sufficient to hold that *mere citation of a general population figure without adequate correlation* will not suffice." McAdory v. Scientific Research Instruments, Inc., 355 F.Supp. 468, 475 (D.Md.1973) (emphasis added).

Plaintiffs maintain, however, that the testimony of Clarence E. Cyrus, a contract compliance specialist with the Defense Supply Agency, supports their case and statistics. It does not.

 Called by Chilton in defense, Mr. Cyrus explained that every contractor doing business with the government, who either employs more than 50 persons or has a contract for more than $10,000 is subject to Executive Order 11246. That order provides that such a "contractor will take affirmative action in hiring minorities, . . . establish policy and procedures that will not discriminate against minorities, . . . develop an affirmative action program in writing . . ." (N.T. 7/12/72, p. 46). Two affirmative action plans submitted by Chilton under the requirements of Executive Order 11246 had been rejected by DSA, but this does not constitute proof of racial discrimination. Rather, it goes to establish that there should be more active assistance to minorities by Chilton if it wishes to continue doing business with the United States.

More in point was Cyrus' testimony that he was familiar with employment practices at Chilton and that he had not seen any evidence of racial discrimination with regard to employment or promotion. (N.T. p. 44).

In the instant case, there has been no direct evidence that the plaintiff, Nadine Louis, the intervenor plaintiffs, or anyone else was denied employment or promotion because of race. There has

been no expert testimony to explain, validate or correlate any statistical data. What evidence there is is insufficient to show discrimination by Chilton or to shift the burden to defendant to explain its employment practices.

## IV. THE HUMAN RELATIONS COMMISSION

Plaintiffs presented five witnesses at the hearing on this matter. Four testified as to the absence of any pre-loan racial discrimination investigation by PIDA. The fifth witness was Neil Thomas, a consultant for the Pennsylvania Human Relations Commission (HRC). The majority of his testimony was related to a project he headed for the study of employment discrimination in Pennsylvania. The project began three years before with HRC's selection of 25 companies for enforcement action (N.T. p. 8).[15] Based upon the experience of the HRC with these firms, a set of interrogatories was developed which would reveal a company's employment practices. In addition, HRC learned in a general way how to administer the statute from these cases (N.T. 9).

As a result of the work done as to these 25 employers, the HRC decided to "pick and choose" targets for its enforcement actions (N.T. p. 27). A set of criteria was developed which included the size of the company, the disparities between minority employment and minority population in the surrounding areas, similar disparities as to women in the work force, and other indices not specifically described (N.T. p. 30). In its written memo, "EEOC Project Report—Analysis of Targets," D–10, two criteria were described: one ignored Commission experience and judgment and sought only the biggest pay-off in the terms of jobs for minorities and women; the other was based strictly on HRC's experience and judgment.[16] The

15. Thomas testified on May 11, 1972.

16. "It is unlikely that all 100 targets for Commission initiated pattern and practice cases will be started at the same time.

Therefore two basic criteria for the ranking of companies has (sic) been developed. The first criterion is based on an analysis of the pay-off in terms of number of jobs that can possible (sic) be acquired for minorities *and*

targets were selected in this way so HRC could bring enforcement action which would eliminate the most discrimination with the least expenditure of its resources (N.T. p. 27). The purpose was to attack discrimination on a "wholesale" basis (N.T. p. 33).

Specifically, the EEO1 forms of 13,000 Pennsylvania employers were analyzed and 550 were selected by the HRC as being "the most likely companies to have the most pervasive discriminatory practices based upon the information that was available" (N.T. p. 30). To these 550 employers, HRC sent a questionnaire seeking further information. Approximately 90% responded to this request. There was no follow-up as to those which did not answer the questionnaire because HRC's purpose was only to get a "rough idea for planning purposes, not to be in anyway totally and completely comprehensive." (N.T. p. 76). Based upon this additional information, the list of 550 firms was further refined by apparently applying the same standards and additional information,[17] until there were only 85 employers remaining, two or three of which were among the 55 that did not respond to the questionnaire (N.T. p. 76).

The undated list of 85 employers selected for enforcement action was completed by mid-Winter, 1971–72. Chilton's name did not appear on it, although Chilton had answered the second request for information on October 6, 1971 (N.T. pp. 39, 42). After suit was started in this case, Chilton's name was added to the list (N.T. p. 49), having been omitted by the "purest coincidence" in part because Chilton's information was received on October 6, rather than in September (N.T. p. 51). In any event, HRC determined that Chilton should have been No. 23 on its selected target list.

Plaintiffs assert that Thomas' testimony validates and gives meaning to their statistical evidence or in and of itself shows Chilton discriminates against Blacks. Neither is the case.

In the first place, as Thomas plainly said, HRC's purpose was to compile a list of targets. It has made no official determination that Chilton discriminates (N.T. p. 59). HRC wanted to get a rough idea for planning purposes, not be totally complete and comprehensive. It was interested in conserving its own resources and attacking discrimination on a wholesale basis. HRC's rough ideas add nothing to plaintiffs' statistics.

Secondly, Chilton's rank of twenty-third on HRC's list has no evidentiary value. It does not establish, as plaintiffs contend, that "Chilton ranks 23rd worst in terms of employment discrimination in the Commonwealth,." [18] The twenty-five companies on HRC's first list were not on its second target list. Thus, Chilton may have really ranked 48th in HRC's priority. Only two or three of the 55 companies which failed to answer the second questionnaire were included as HRC targets, although their refusal to provide additional data in HRC's judgment might permit the inference that the information, if supplied, would have been unfavorable to those companies (N.T. p. 77). Perhaps some or all of those 52 or 53 may have been more deserving of HRC's attention than was Chilton, and thus Chilton should

women in any given company or organization. This analysis does not take into consideration Commission experience with any company or its judgment of the general effects of a company's policies on a community. The second criterion for selection, the Commission's experience and judgment, will have to be superimposed by Commission staff on the strictly statistical comparisons contained in this report." (emphasis added).

17. Apparently this additional information included complaints to HRC for 10 years, complaints to the EEOC, data from 80 staff members, and studies from a network of voluntary citizen advisory councils throughout the Commonwealth (N.T. pp. 31–32, 47).

18. Document 57, p. 6.

have been ranked between No. 75 and No. 100. If Chilton's rating had been eighty-sixth or above, it would not have been listed at all [19] since the last 15 of the 100 targets were unions. More importantly, whether Chilton should be twenty-third, forty-eighth, one hundredth, or not on the list at all is quite meaningless so far as this case is concerned. The list was compiled by persons who did not testify. It was based in part on their experience and judgment neither of which was described for me. In turn, these unknown persons relied upon complaints, some of which may have been 10 years old, staff "data," and upon "studies," whatever they are, supplied by a network of volunteer citizen advisory councils. In short, there was considerable mystery as to when, why, and in which way who decided what about whom.

Thirdly, when HRC turned its turrets toward its targets, it cranked into its fire control computer a factor which is not germane to this case, i. e., alleged discrimination as to women (N.T. pp. 47, 55, 56, 69, and 70). This suit deals solely with alleged discrimination as to Blacks and thus HRC's determinations are irrelevant.

Fourth, HRC's figures as to alleged minority employment discrimination were relative and not absolute. HRC's list was compiled by comparing the number of minority employees to minority population, not by comparing minority employees to available minority workers (N.T. pp. 69–70, 95–98). While HRC's method may provide a satisfactory way to rate one company against another since the same mistake is repeated as to all, it does not yield a true picture as to whether there is discrimination or not.[20]

Finally, HRC was going after big companies per se. There may have been hundreds of smaller concerns with records of discrimination far worse than Chilton's. HRC simply ignored them.

Thomas' testimony was not devoid of interest, however. Hearing him justify HRC's failure to follow up on an earlier contact with PIDA because HRC was busy with its budget was a classic description of bureaucracy confronting its moment of truth. Despite the statutory duty imposed on HRC to "make recommendations to agencies and officers of the Commonwealth," 43 P.S. § 957, and despite the fact that the Courts of Pennsylvania have declared the responsibility to regulate employment practices in the Commonwealth rests on HRC rather than other state agencies,[21] first things first. As Mr. Thomas put it, "It just happens—it happens that the time period to which you are referring is our budget time period . . . There are matters, frankly, that are more important such as our budget." (N.T. p. 83).

For my own part, I cannot help but speculate: If HRC had not been so preoccupied with its budget, would a simple phone call from HRC to PIDA have made this case unnecessary? After all, both PIDA and HRC are parts of the same executive branch of the same state government. Both have offices in Harrisburg. It does seem a bit circuitous to communicate with each other via a federal court in Philadelphia.

In view of the fact that HRC was created to bring an end to discrimination, it was fascinating to hear Thomas explain why Chilton's request for an opportunity to discuss its equal employment opportunity projects was ignored —as are all such requests for help from all employers (N.T. p. 64). As Thomas put it, once the HRC has made a study and decided to go after an employer, HRC's role is like that of a district at-

---

19. A more reliable way to have avoided being an HRC target would have been to refuse to answer HRC's questionnaire.

20. If 550 children are all measured with the same yardstick, the tallest 100 can be identified even if the yardstick is an inch too short. If this error is ignored, however, no child's actual height will be correctly computed.

21. N.A.A.C.P. v. P.U.C. and Philadelphia Electric Company, 5 Pa.Cmwlth. 312, 317, 290 A.2d 704 (1972).

torney (N.T. pp. 99–101, 109–110). I could find nothing in the Pennsylvania Human Relations Act which suggested the legislature believed that discrimination could better be ended by attack than advice, or that prosecution was preferred to persuasion. I gather from what Thomas said that others have this same trouble. In all fairness to Thomas, though, the fact that he added nothing to plaintiffs' case was hardly his fault. HRC's list was no more intended to prove anything in court than is a target sleeve towed behind a drone intended to carry passengers.

## V. CONCLUSION

In summary, this is a matter in which plaintiffs, who were not injured, relied on precedent, *Shannon*, which is not applicable, and brought suit to end discrimination which they did not show existed. It is also quite possible that they sued the wrong state agency. In any event, their prayer for relief against PIDA must be denied.

This opinion shall constitute my findings of fact and conclusions of law, and an order shall be entered accordingly.