493 F.2d 191
 7 Fair Empl.Prac.Cas. 1164, 7 Empl. Prac.
Dec. P 9289
Mrs. Natalie BOLTON, Individually and on behalf of all
others similarly situated, Plaintiff-Appellant,
v.
MURRAY ENVELOPE CORPORATION, Defendant-Appellee.
 No. 73-1856.
 United States Court of Appeals, Fifth Circuit.
 April 26, 1974
Rehearing and Rehearing En Banc Denied May 30, 1974.
 
 Melvyn R. Leventhal, Fred L. Banks, Jr., Jackson, Miss., for plaintiff-appellant.
 Herbert R. Ginsberg, M. M. Roberts, Hattiesburg, Miss., for defendant-appellee.
 Before COLEMAN, CLARK and GEE, Circuit Judges.
 COLEMAN, Circuit Judge:
 
 
 1
 This appeal is from a judgment for defendant, Murray Envelope Corporation (Murray), in a suit alleging racial discrimination in employment practices, Title VII of the Civil Rights Act of 1964, 42 U.S.C., 2000e.
 
 
 2
 Plaintiff, Natalie Bolton, a member of the Negro race, brought the charge against Murray, alleging that her employment was terminated as the result of racial discrimination. She also sued in the name of a class composed of all Negro employees, both those terminated and those allegedly improperly detained in menial jobs as a result of the racially discriminatory policies and procedures of the defendant corporation. Murray contends that it has been free of discrimination since 1962 and that Bolton was discharged because of substandard production.
 
 
 3
 The trial court, sitting without a jury, determined that the individual employee, Mrs. Bolton, and the class she represented had not, in fact, been the victims of racial discrimination. If did order Murray to post notice of its compliance with federal requirements as to integrated facilities.
 
 
 4
 Murray Envelope Company was established in 1943 with approximately 50 employees and has since grown to its present size of approximately 250-300 employees. Its plant is located in Hattiesburg, Mississippi, and draws its employees from that area. Hattiesburg has a population of approximately 40,000 of whom 29% Are black; Forrest County, in which Hattiesburg is located, has a population of approximately 58,000, of whom 25% Are black.
 
 
 5
 Murray produces a wide variety of stationery and envelopes in varying sizes. This process requires many machine operators, pressmen, and printing employees, in addition to the normal number of clerical and day laborer positions which accompany any production procedure. Murray admits racially discriminatory practices prior to 1962. However, it contends that in 1962 these were discontinued.
 
 
 6
 There are no positions at Murray which necessitate prerequisite special training or education. All employees begin as trainees. Murray has employed some people with less than a tenth grade education, but employees of at least that educational level are preferred. The semi-skilled and skilled positions in the company are filled by on-the-job training of the originally unskilled employees. The policy for promotions, according to Murray, is to promote from 'within' if at all possible. The testimony reflected, however, that there are no objective, published standards or guidelines for such promotions. Instead, the subjective determination of the supervisory staff is relied upon for both initial job assignments and for subsequent promotions.
 
 
 7
 Prospective employees at Murray are obtained primarily through the Mississippi Employment Service, 'word of mouth' recruitment, and independent, unsolicited inquiries and applications made directly to the company. The testimony reflected that newspaper advertisements had been used in an attempt to obtain skilled machine operators, had been of little success, and were therefore infrequently used.
 
 
 8
 * The Named Plaintiff
 
 
 9
 Mrs. Bolton, the named plaintiff, alleges that she was discharged from her machine operator position as a result of racially discriminatory policies of Murray. Murray contends, however, that Mrs. Bolton was discharged for substandard production. The District Court, upon hearing all the evidence and weighing the credibility of such evidence, found, as a matter of fact, that Mrs. Bolton had been discharged for substandard production.
 
 
 10
 In Smith v. Universal Services, Inc., 5 Cir., 1972, 454 F.2d 154, there was a conflict in the testimony between an employee and his supervisor as to the reasons for the employee being restricted in singing religious songs at work. The employee contended that the restriction was due to religious discrimination and that this discrimination was the cause for an end of his employment. His supervisor, however, testified that the employee had been restricted from singing for his own protection from other workers. We held that this was a credibility choice and within the discretion of the trial judge as to whom to believe, and that our review was governed by 52(a) F.R.Civ.Pro. In the present appeal, the factual finding that Mrs. Bolton was discharged for inadequate production, like the determination in Smith,supra, is a finding of fact which can be set aside only if it lacks substantial evidence to support it.
 
 
 11
 The testimony showed that Murray operates two shifts. Mrs. Bolton was the night operator on an open-end machine. The employee who operated Mrs. Bolton's machine on the day shift testified that her production was consistently 20-25% Higher than Mrs. Bolton's. The daytime operator further testified that she considered herself no more than an average producer. Her comparison of Mrs. Bolton's work to hers was based upon a daily log which the employees of each machine kept and which remained with the machine during the change of shifts in order that the operators of the same machine could coordinate their production.
 
 
 12
 There was also testimony from two of Mrs. Bolton's supervisors as to her substandard production. The supervisors testified that on several occasions Mrs. Bolton had been warned of this but with no subsequent improvement on her part. Mrs. Bolton, however, testified that she had never been warned that her production was considered substandard and that no objective guidelines as to what was average or low production was ever explained to her.
 
 
 13
 In 1964 Murray had 84 machine operators, of whom only one was black. In 1970 there were 84 whites and 33 blacks. These statistics support the contention that Murray was making a concerted effort to employ black machine operators.
 
 
 14
 Moreover, the trial judge chose to believe the supervisors as to the continued low production warnings as well as the testimony concerning her substandard production. Hence, we find ourselves, within the four corners of the clearly erroneous rule, unable to overturn these findings.
 
 II
 The Class
 
 15
 The affirmance as to the named plaintiff, however, does not invalidate the class action claim, which may be separately reviewed, Huff v. Cass Company of Alabama, 5 Cir., 1973, 485 F.2d 710 (En Banc).
 
 
 16
 In United States v. Jacksonville Terminal Company, 5 Cir., 1971,451 F.2d 418, we held that findings of 'ultimate' fact such as whether a series of acts did or did not establish the existence of a violation of Title VII was a legal conclusion and not controlled by the 'clearly erroneous' rule. The application of 52(a) in the individual action and its non-applicability to the class determination is illustrated by the following from Jacksonville:
 
 
 17
 'Based on these general premises, the Government challenges the District Court's findings of fact and conclusions of law. In this regard, the Government's quarrel is not so much with the empirical facts actually found by the trial judge as with his selectivity regarding pertinent facts which merited consideration. Because of his conservative misconceptions as to his proper factfinding role and as to the extent of the Government's burden of proof, the Government argues, the judge's perspective was too myopic. Further, he allegedly erred in his findings of ultimate fact (such as conclusory statements that particular acts, or series of acts, did not establish the existence of discrimination or discriminatory intent as defined in Title VII), as well as his legal conclusions derived from the factual milieu. Insofar as the Government's attack is predicated on these grounds, the 'clearly erroneous' rule is not a bulwark hindering appellate review.' At Page 423.
 
 
 18
 Appellant does not allege that Murray has discriminatorily hired since the inception of the Civil Rights Act of 1964, but instead alleges that its job assignment, promotion, and termination procedures have discriminated against blacks as a class. As to this we may be guided by several firmly established concepts. First, we note that the amount of discrimination is irrelevant, Rowe v. General Motors Corporation, 5 Cir., 1972, 457 F.2d 348. It is also clear that employer motive is not a justification for procedures which produce discriminatory results. As we said in Rowe, supra:
 
 
 19
 'It is clearly not enough under Title VII that the procedures utilized by employers are fair in form. These procedures must in fact be fair in operation. Likewise, the intent of employers who utilize such discriminatory procedures is not controlling since 'Congress directed the thrust of the Act to the consequences of employment practices, not simply the motivation'. Griggs v. Duke Power Company, supra, 401 U.S. 432, 91 S.Ct. at 854, 28 L.Ed.2d at 165.' At Page 355.
 
 
 20
 If the standards, procedures, and policies of the defendant do operate so as to deny blacks better job assignments initially and promotional opportunities in the future, if they restrict blacks to the more menial positions within the employer's company, and if the discharge rate is significantly higher for blacks than for whites, then the employer must establish that a 'business necessity' has been the cause for the apparently discriminatory results of his procedures, Rowe v. General Motors Corporation,supra.
 
 
 21
 Five legal size pages of intensive, uncontroverted statistics, not appended to this opinion, reveal that an exact comparison of year to year employment figures is not possible. Murray's operation has not only grown but has also changed to such a degree that job assignments and job categories have varied over the years.
 
 
 22
 The record clearly shows that assignments to the more menial areas have gone predominantly to blacks while assignments to the more skilled positions have been given to whites. For example, from 1964 to 1970, the number of black porters has almost doubled while the number of white porters has stayed the same. The printing department was all white in 1964 and remained so in 1970. The same is true for clerical and office workers. Further, the machine adjusters, who approach a very skilled designation and therefore a higher paying position, have decreased in black representation from 1964 to 1970-- nine white and three black to fourteen white and one black. In 1970, 34% Of the blacks were in janitorial positions while less than 6% Of the whites held such positions.
 
 
 23
 While it is true that the overall turnover at Murray of both blacks and whites is extremely high, blacks are discharged at twice the rate of whites. This condition exists in the absence of objective standards to guide both supervisors and employees as to what is expected of the employee.
 
 
 24
 No mention of these statistically disparate results are found in the District Court's opinion but their significance cannot be ignored. That significance is magnified when appraised in light of the fact that Murray has little, if any, initial job qualifications requirements. In nearly every situation, the hiring, initial job assignment, and promotion is almost exclusively a subjective determination made by white supervisors. As was said in Jacksonville, supra, 451 F.2d at page 446:
 
 
 25
 'In some situations, when blacks have been excluded from white jobs for no apparent reason, statistics have carried the day. Because blacks were denied certain jobs regardless of qualifications, little or no corroborating evidence revealing specific instances of post-Act exclusion was necessary . . .. Bing v. Roadway Express, Inc., 5 Cir., 1971, (444 F.2d 687); Jones v. Lee Way Motor Freight, Inc., 10 Cir., 1970, (431 F.2d 245, cert. denied 1971, 401 U.S. 954, 91 S.Ct. 972, 28 L.Ed.2d 237).'
 
 
 26
 In addition to the significant statistical disparities between blacks and whites, the record showed that on one occasion a black with a twelfth grade education was hired by Murray and assigned a janitorial position; while only eight days later a white applicant with only a ninth grade education was employed and assigned to a semi-skilled trainee position which offered vastly more opportunity for advancement. The Company explanation for this was that applicants for jobs were automatically assigned whatever was available at the time of their hiring. However, there was evidence of Murray hiring a white employee in one position in order to hold him until an opening in another department became available. When the opening for which the applicant was better suited became available, he was transferred to the new position. There was no explanation as to why this procedure could not have been used to place the black employee with a twelfth grade education in a better position which became available only eight days after he was hired.
 
 
 27
 The above statistical and specific disparties between white and black employees must be 'justified' by proper 'business necessity' or a Title VII violation has occurred. See, Griggs v. Duke Power Company, 1971, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158; Rowe v. General Motors Corporation, supra; United States v. Jacksonville Terminal Company, supra. Murray did not meet the business necessity burden. The only evidence which might justify the disparate results were conclusory statements by Murray that race was no consideration in job assignment and that their policy of immediately placing a new employee in whatever opening is available is racially neutral. This is no explication of a 'business necessity' but is only a declaration that facially neutral policies have been used. This is not enough:
 
 
 28
 'It is therefore clear that employment practices which operate to discriminate against people because of their race, color, religion, sex or national origin, violate Title VII, even though the practices are fair on their face and even though the employer had no subjective intent to discriminate.' Rowe v. General Motors, supra, 457 F.2d 348, 355.
 
 
 29
 We are compelled, therefore, to hold that the District Court should have held for the class as to Title VII violations and should, accordingly, have formulated an appropriate remedial decree. We remand the case for that purpose, United States v. Georgia Power Company, 5 Cir., 1973, 474 F.2d 906, 926. In the formulation of that remedy, the Court will wish to consult Jacksonville, supra and Rowe, supra, as well as other pertinent authority.
 
 
 30
 Moreover, the Court will require adequate posting of notices in easily understood language, informing the employees of the desegregation of their restroom and cafeteria facilities.
 
 
 31
 As to the plaintiff-appellee Bolton, affirmed; as to the class, reversed and remanded for further proceedings not inconsistent herewith.