Frank WILLIAMS, Plaintiff-Appellant,

v.

TALLAHASSEE MOTORS, INC., Defendant-Appellee.

No. 77–1829.

United States Court of Appeals, Fifth Circuit.

Nov. 30, 1979.

Kent Spriggs, Tallahassee, Fla., for plaintiff-appellant.

W. Dexter Douglass, John C. Cooper, Tallahassee, Fla., for defendant-appellee.

Before WISDOM, AINSWORTH and RONEY, Circuit Judges.

RONEY, Circuit Judge:

In this Title VII employment discrimination case we are asked to reverse the district court's finding of no pattern or practice of discrimination by defendant against blacks as a class and no discrimination by defendant against the individual plaintiff, Frank Williams. Concluding the district court did not err in finding that plaintiff failed to establish his class claim and was not the victim of racial discrimination by defendant, we affirm.

Defendant Tallahassee Motors is a car dealership which has been in business since 1940 and is located in Tallahassee, Florida. Plaintiff was hired as a salesman by defendant in September 1973. At that time he was defendant's only full-time car salesman of a sales force of 20. Plaintiff worked for Tallahassee Motors until he was terminated in January 1974.

Plaintiff sued Tallahassee Motors both individually and as representative of a class certified as all black applicants and employees of defendant. Plaintiff alleged that he was involuntarily terminated because of his race and that his treatment was an integral part of a pattern and practice of discrimination against black persons in defendant's employ.

The district court concluded plaintiff's termination was not racially based and the statistical evidence failed to establish a prima facie case on his class claim. Alternatively, the court held that to the extent a prima facie case had been made, defendant had rebutted it.

The district court's determination of nondiscrimination is a finding of ultimate fact in regard to which we are not bound by the clearly erroneous standard of review. *East v. Romine, Inc.*, 518 F.2d 332, 338 (5th Cir. 1975). The district court's credibility determinations and findings of subsidiary fact are, of course, binding on this Court unless found clearly erroneous. *King v. Gulf Oil Co.*, 581 F.2d 1184, 1186 (5th Cir. 1978); *Bolton v. Murray Envelope Corp.*, 493 F.2d 191 (5th Cir. 1974).

## I. Class Claim

Plaintiff sought to prove his case by statistics, which he contends established a prima facie case of racial discrimination and should have shifted the burden to defendants to rebut the statistics or explain the racial disparity in employment which they demonstrated. *See Rodriguez v. East Texas Motor Freight*, 505 F.2d 40, 54 (5th Cir. 1974), *vacated and remanded on other grounds*, 431 U.S. 395, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977).

Plaintiff submitted demographic statistics comparing the racial compositions of defendant's work force and the area's general population. The figures showed that on June 27, 1974, defendant's work force was 13.6% black. The population of Tallahassee was, according to the 1970 census, 26% "Negro and other races."

Plaintiff's statistics also showed that between 1968 and 1975 defendant had hired 20 "managerial" employees, none of them black. Furthermore, no black had been employed in a managerial capacity before 1968. Defendant had hired 68 salesmen between 1968 and 1975, two of them black. Of the 16 salesmen hired before 1968, none was black. Twenty-seven clerical employees were hired over the eight year period, none of them black. The four clerical employees hired before 1968 had been white. In job positions grouped under "body," 29 employees were hired, four of whom were black. One of the two body employees hired before 1968 was black. In "service" jobs, 67 of the 167 new employees were black. Of those hired before 1968, three of 14 were black.

Statistical evidence also showed that most black employees were in the lowest paying job classifications. Plaintiff showed that in the eight job positions paid on monthly salary, no blacks and 10 whites were employed. In the 23 positions paid on weekly salary, two blacks and 33 whites were employed. In the 14 job positions paid on hourly wage, 12 blacks and 19 whites were employed. Seven of the 12 blacks receiving hourly wages were in jobs with the two lowest hourly wage rates.

Although a prima facie case of racial discrimination may be established by nothing more than valid statistical evidence of a significant discriminatory impact of defendant's practices, *Rodriguez v. East Texas Motor Freight*, 505 F.2d at 53; *United States v. Hayes International Corp.*, 456 F.2d 112, 120 (5th Cir. 1972), the usefulness of such statistics varies with the surrounding facts and circumstances, which either support or undermine the inference of discrimination offered by the statistics. *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 340, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977); *United States v. Ironworkers Local 86*, 443 F.2d 544, 551 (9th Cir.), *cert. denied*, 404 U.S. 984, 92 S.Ct. 447, 30 L.Ed.2d 367 (1971).

The district court in this case concluded that plaintiff's statistics did not produce so disparate a percentage as to alone make a prima facie case and observed that where there is no great disparity, there should be further proof that qualified blacks had applied. Noting first that plaintiff's statistical case was not as strong as that of other statistical cases treated by the Fifth Circuit, the court thought that the statistics with respect to a relatively small employer such as Tallahassee Motors had to be regarded with caution, citing *McAdory v. Scientific Research Instruments, Inc.*, 355 F.Supp. 468 (D.Md.1973).

Then in a supplemental order, in response to plaintiff's motion to amend the judgment, the court said:

What constitutes "substantial" disparity is not a precise legal standard. While statistics may be used to establish a prima facie case, the statistics produced here are not so disparate a percentage as to establish a prima facie violation of Title VII. It must be remembered that defendant is a small local employer who does not have a training program or a system of promotion; neither are tests administered or other application processes utilized. Defendant relies for its hiring on experienced people who walk in off the street. Plaintiff has not as-

sembled any statistics regarding numbers of applicants, qualified or unqualified, black or white. Plaintiff relies solely on showing the number of blacks working for the defendant and the type of positions held, pointing to the paucity of black mechanics, salesmen and clerical workers. Several decisions have cautioned against the bare use of inextensive statistics for small companies and have required, where there was a lack of a great disparity in minority employment as compared to population, some proof beyond the statistics which would tend to show that there were blacks who had in fact applied for jobs and were qualified. *See, e. g., Keely v. Westinghouse Electric Corp.*, 404 F.Supp. 573 (E.D.Mo.1975); *Louis v. Pennsylvania Industrial Development Authority*, 371 F.Supp. 877 (E.D.Pa. 1974), *affd.*, 505 F.2d 730, *cert. denied*, 420 U.S. 993 [95 S.Ct. 1430, 43 L.Ed.2d 674] (1975); *McAdory v. Scientific Research Instruments, Inc.*, 355 F.Supp. 468 (D.Md.1973). The Fifth Circuit has stated:

> [C]omparison with general population statistics is of questionable value when we are considering positions for which, as here, the general population is not presumptively qualified. *Hester v. Southern Railway Co.*, 497 F.2d 1374, 1379 n.6 (5 Cir. 1974).

In *Hester*, the court also stated:

> The most direct route to proof of racial discrimination in hiring is proof of disparity between the percentage of blacks among those applying for a particular position and the percentage of blacks among those hired for the position. 497 F.2d at 1379.

The court is mindful of recent Fifth Circuit decisions finding that statistical evidence established a prima facie case. However, in the factual context of this case as outlined above, the court finds that plaintiff's evidence was insufficient to make out such a case. Assuming, though, that this plaintiff's statistics were deemed sufficient alone to shift the burden, the considerations dealt with above as to defendant's business prac-

tices, along with other testimony and evidence presented by defendant regarding the relative paucity of qualified black employees, was sufficient to rebut the prima facie case.

Although in a number of cases this Court and others have found a prima facie case established without evidence of qualifications, the inference of discrimination was generally supported by a far more compelling level of racial underrepresentation, usually in a much larger work force, than reflected by plaintiff's figures. In *United States v. Hayes International Corp.*, 456 F.2d at 120, for example, the Court explicitly stated that the burden of proving lack of qualifications was on defendant after plaintiff showed that in Birmingham, Alabama, whose population was 30% black, defendant's 924 person office and technical staff was less than one percent black and of 299 such employees hired since the suit was brought, less than five percent were black. In *Parham v. Southwestern Bell Telephone Co.*, 433 F.2d 421 (8th Cir. 1970), the court found that plaintiff's statistics proved a Title VII violation as a matter of law where 22% of Arkansas' population was black yet defendant's work force of 2,736 persons was less than two percent black. *See also Jones v. Tri-County Electric Cooperative, Inc.*, 512 F.2d 1 (5th Cir. 1975) (while relevant geographical area was 40% nonwhite, defendant employed one black of 50 employees at time suit filed).

■ Since plaintiff's statistics clearly do not validly depict a gross statistical disparity sufficient to constitute a prima facie case on its own, the "paucity of qualified black employees" is of course a relevant consideration when the statistics are not compelling. In *Hazelwood School District v. United States*, 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977), the Supreme Court clearly approved the use of a narrower labor pool defined by the qualifications for employment in a defendant's work force. The Court explained,

> When special qualifications are required to fill particular jobs, comparisons to the

general population (rather than to the smaller group of individuals who possess the necessary qualifications) may have little probative value.

433 U.S. at 308 n.13, 97 S.Ct. at 2742. *See also Roman v. ESB, Inc.*, 550 F.2d 1343, 1354–1355 (4th Cir. 1976) (*en banc*); *Keely v. Westinghouse Electric Corp.*, 404 F.Supp. 573, 579 (E.D.Mo.1975); *Louis v. Pennsylvania Industrial Development Authority*, 371 F.Supp. 877, 884–885 (E.D.Pa.), *aff'd*, 505 F.2d 730 (3d Cir. 1974), *cert. denied*, 420 U.S. 993, 95 S.Ct. 1430, 43 L.Ed.2d 674 (1975); *McAdory v. Scientific Research Instruments, Inc.*, 355 F.Supp. at 475; *Dobbins v. Local 212, International Brotherhood of Electrical Workers*, 292 F.Supp. 413, 445–446 (S.D.Ohio 1968).

On this point the district court weighed the statistical evidence against the testimony of Col. William E. Jenkins, a black official at Florida A & M University and owner of a Firestone service station in Tallahassee, to the effect that he had difficulty in recruiting qualified black employees for his business. Both the court and the parties were well aware that in a city such as Tallahassee, which is the state capital with a large governmental complex and the home of a large university which predominately hires blacks, the general population figures would not necessarily reflect the labor pool available to private employers.

As to the fact of discrimination, the court was particularly impressed with the testimony of Early Harris, Jr., a black employee of defendant, who testified that he had personally experienced no discrimination and had witnessed no discrimination against other black employees at Tallahassee Motors because of race. The testimony of Al McCoy, a former part-time car salesman associated with Tallahassee's EEO office, supported defendant's claims of non-discrimination. The district court found it significant that this testimony was buttressed by the co-owners, who testified as to their recruiting efforts. The court found the evidence to show that plaintiff in this case was hired in a "conscious effort to increase the number of black employees at Tallahassee Motors, and more pragmatically, to tap the black car-buying market in the Tallahassee area."

The district court was not incorrect in treating the statistical evidence with caution in view of the relatively small number of employees at Tallahassee Motors. While there is no numerical cutoff point for statistical significance, the smaller the sample size, the greater the likelihood that the underrepresentation reflects chance rather than discriminatory practices. In *Ochoa v. Monsanto Co.*, 473 F.2d 318, 320 (5th Cir. 1973), for example, the Court held that because of the smallness of the numbers involved, the district court was not compelled to set in train the usual presumptions. Courts have suggested on many other occasions that the "small universe" to which statistics relate may preclude significant comparisons. *See, e. g., Mayor of Philadelphia v. Educational Equality League*, 415 U.S. 605, 621, 94 S.Ct. 1332, 39 L.Ed.2d 630 (1974) (underrepresentation of blacks on 13-member panel); *Adams v. Reed*, 567 F.2d 1283, 1287 (5th Cir. 1978); *Robinson v. City of Dallas*, 514 F.2d 1271, 1273 (5th Cir. 1975); *Cupples v. Transport Insurance Co.*, 371 F.Supp. 146, 149 n.1 (N.D.Tex.), *aff'd*, 498 F.2d 1091 (5th Cir. 1974) (small number of females less probative in company of only 90 employees than in larger company). *But see Long v. Sapp*, 502 F.2d 34, 40–41 (5th Cir. 1974) (without discussing sample size, Court found prima facie case where plaintiff showed, among other things, that two of county's 51 employees were black).

To buttress his statistical evidence of defendant's pattern or practice of discrimination, plaintiff argues other evidence in support of his class allegations.

Plaintiff maintains that defendant's minority recruiting efforts were minimal. For example, while one of defendant's vice presidents professed a strong interest in hiring qualified blacks and had spoken to the president of Florida A & M University, a largely black university in Tallahassee, about referring qualified blacks, he failed to visit the school's placement office. Plaintiff points out that although defend-

ant's sales manager spoke once to Col. Jenkins, the university's director of development, about referring black salesmen, he never followed up on the conversation. This evidence does little to suggest racial discrimination on the part of defendant and is negated to some extent by the fact that the sales manager personally recruited as a salesman Early Harris, Jr., a black with whom he had served in the Air Force. The record shows that plaintiff himself was hired in a conscious effort to increase defendant's black employees.

Plaintiff attempted to show a white employee had been fired for living with a black woman. The witness who testified to the motivation for the discharge was determined by the district court to be less credible than defendant's vice president who denied the allegation.

Plaintiff submitted considerable evidence intended to show discriminatory treatment of plaintiff himself. It was not found persuasive by the district court and is dealt with in the section which follows.

While plaintiff produced some uncontested evidence which suggests discriminatory practices, such as the fact that several blacks were hired as porters who had several years of college or more skilled work experience, that evidence would not permit us to reverse the court's decision on the class claim.

On the record of this case, granting the credibility choices which are the concern of the trial court, we cannot hold as erroneous the decision of the district court that the plaintiff was not entitled to win on its claim of class discrimination.

## II. *Individual Claim*

■ The district court also found for defendant on plaintiff's individual claim. Plaintiff argues that discrimination is evident in the terms and conditions of plaintiff's employment. For example, plaintiff charges that he was given a demonstrator truck rather than a more desirable car as he requested, he was not told immediately that he was entitled to free gasoline, he experienced delay in receiving his business cards, he was excluded from a special sales meet-

ing and his weekly "draw" or advance against his commission earnings was set at $75.00 instead of $100.00 like most other salesmen.

The district court, in findings not shown to be clearly erroneous, determined that the truck was assigned to plaintiff because it was a model requiring maximum sales exposure at the time and plaintiff was given a Mustang demonstrator a few weeks later. The sales manager testified that a number of other salesmen were also in that truck for a short time. The court found plaintiff was not informed of the sales meeting because he was absent at the time of its announcement. The evidence was conflicting as to whether plaintiff or defendant chose $75.00 for the draw, but the court found the lower draw amount insignificant as it reflected only an advance on compensation which would depend on sales commissions. While the court made no findings regarding the free gasoline and business cards, the record evidence does not suggest that either incident was the product of discrimination.

Plaintiff contends that his termination was racially motivated. The district court found, however, that plaintiff "was an unfortunate victim of economic circumstances." Defendant's witnesses testified that car sales dropped drastically during the period of plaintiff's employment due to the Arab oil embargo and energy crisis and that several low-producing salesmen who had been employed less than a year were dropped. One of defendant's experienced salesmen testified that plaintiff was having particular trouble due to his inexperience. Plaintiff argues that he did not have a poor sales record and points to the fact that his commissions had exceeded his draw in the last three months before termination. While plaintiff's sales record was better than those of two white salesmen laid off at the same time, each of whom had been a total of more than $100.00 under his draw ($100.00) for the last two months employed, plaintiff exceeded his $75.00 draw by only $48.13 and $7.36, respectively, in his last two months and would have been under his draw in the last month had it been set at $100.00. The record does not show whether

defendant retained any white short-term salesmen with worse records than plaintiff's.

After termination defendant stated on an unemployment compensation form that plaintiff had been fired. The error was corrected as soon as plaintiff brought it to defendant's attention.

The court's conclusion that plaintiff's employment was not terminated due to racial discrimination is not clearly erroneous. *See Jenkins v. Caddo-Bossier Association for Retarded Children*, 570 F.2d 1227 (5th Cir. 1978); *Swint v. Pullman-Standard*, 539 F.2d 77, 105 (5th Cir. 1976); *Bolton v. Murray Envelope Corp.*, 493 F.2d at 194.

AFFIRMED.