Caroline M. FISHER, Plaintiff,

v.

DILLARD UNIVERSITY, Defendant.

Civ. A. No. 77–3205.

United States District Court,
E. D. Louisiana.

Aug. 18, 1980.

George M. Strickler, Jr., New Orleans, La., for plaintiff.

Albert H. Hanemann, Jr., New Orleans, La., for defendant.

## OPINION

CASSIBRY, District Judge:

Plaintiff, Caroline Fisher, a white woman, brought this suit against her former employer, Dillard University of New Orleans, Louisiana, a predominantly black university, claiming that she was a victim of racial discrimination. Plaintiff claims that during the two years that she was employed at Dillard, defendant paid her less than comparable teachers because of her race. She also claims that Dillard did not renew her contract for a third year because of her race. Fisher brought suit under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e–16 (1976 and Supp. II 1978), and 42 U.S.C. § 1981 (1976).[1] Jurisdiction is based on 28 U.S.C. § 1343 (1976) and 42 U.S.C. § 2000e–5(f)(3) (1976). Trial was commenced November 8, 1979 and was heard by the Court sitting without a jury. I find for plaintiff on each of her causes of action.

## I. INTRODUCTION

Caroline Fisher was awarded a Ph.D. in psychology from Bowling Green State University in September, 1975. Her area of specialization was experimental psychology. In the spring of 1975, as Dr. Fisher was completing the requirements for her degree, Dr. Brenda Rutherford–Lyles (Dr. Lyles) (black), an assistant professor of psychology at Dillard, contacted her about a teaching position. Fisher was interviewed by Dr. Carolyn Reynolds (black), Chairperson of the Division of Education, Dr. Daniel Thompson (black), Vice President of Academic Affairs, and others. Subsequently, Dr. Samuel DuBois Cook (black), President of Dillard, offered her a position as Assistant Professor of Psychology for the 1975–76 academic year at a salary of $13,500.

Fisher accepted the offer and commenced teaching in August of 1975. At that time, the members of the psychology department were Dr. Lyles, who held a Ph.D. in school psychology; Wayne Alcock, a white male instructor with an M.A. in psychology; Dr.

---

1. Plaintiff also alleged a violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d–2000d–6 (1976 and Supp. II 1978), which proscribes discrimination by institutions receiving federal funds. Plaintiff tried the suit as a Title VII suit, so I will confine my discussion to that statute, although any finding of discrimination under Title VII would also implicate Title VI.

Arvind Parikh, an Indian with an Ed.D. who taught some introductory psychology courses; and plaintiff. The psychology department was within the Division of Education, headed by Dr. Reynolds. Lyles held an unofficial position as "Coordinator of Psychology", serving as an administrative link between the psychology faculty and the Division Chairperson, Reynolds. Fisher taught a full course load during her first year, sharing responsibility for the advanced courses with Lyles, the only other Ph.D. on the psychology faculty.

In March, 1976, Cook wrote Fisher offering to renew her contract for the 1976–77 school year at a salary of $13,905. Fisher was not happy with the proposed increase in her salary and wrote Cook asking for an adjustment. Cook wrote Fisher back that it would not be possible to adjust her salary and gave her the "choice" to return to Dillard on its terms. Fisher accepted the contract at the proposed salary.

Also in the spring of 1976, Lyles announced that she would resign at the end of that year. Fisher and Lyles recruited a replacement, and Dillard eventually hired Annie Lee Jones (black), who at the time was completing her doctorate in clinical psychology. During the 1976–77 academic year, the psychology department members were plaintiff, Jones, and Chris Arthur, a black instructor with a Master's Degree. Fisher taught a full course load during the fall semester.

On December 9, 1976, Cook wrote Fisher that her contract would not be renewed for the 1977–78 year. Reynolds told Fisher that she did not know the reason for her termination. Fisher met with Cook as well, but he gave her no explanation. Fisher finished the academic year, but in February she filed a charge with the EEOC, claiming that Dillard discriminated against her with respect to her salary and her termination.

## II. STATUTES OF LIMITATIONS

Plaintiff signed her first year contract to teach at Dillard on June 24, 1975 for the 1975–76 academic year. She signed her contract for the 1976–77 academic year on April 15, 1976. Dillard notified plaintiff by letter dated December 9, 1976 that her teaching contract would not be renewed for the 1977–78 academic year. Plaintiff filed a charge with the Equal Employment Opportunity Commission (EEOC) on February 28, 1977 charging Dillard with discrimination on the basis of her salary and non-renewal of her contract. Plaintiff's last date of employment at Dillard was in June of 1977. The EEOC issued a "Notice of Right to Sue" to Dr. Fisher on September 30, 1977, and she filed suit in this court October 27, 1977. Defendant argues that plaintiff's claims for discrimination in pay have prescribed.

Under Title VII, a charge must be filed within 180 days of the unlawful employment practice. 42 U.S.C. § 2000e–5(e) (1976). Defendant argues that any salary discrimination for the first contract occurred in June of 1975, and for the second contract in April of 1976, when plaintiff signed the respective contracts. Because plaintiff filed her charge with the EEOC in February of 1977, defendant argues, plaintiff did not comply with the 180 day requirement.

■ Under Title VII, discrimination as to salary is held to be a continuing violation of the law. A charge attacking a continuing violation such as salary discrimination is timely if it is filed within 180 days of the last act of alleged discrimination. *Clark v. Olinkraft, Inc.*, 556 F.2d 1219 (5th Cir. 1977), *cert. denied*, 434 U.S. 1069, 98 S.Ct. 1251, 55 L.Ed.2d 772 (1978). In *Clark*, the plaintiff alleged that she had been paid less for the same work than men who had less seniority than she over a period in excess of ten years. She alleged that the violation was presently continuing, filed her EEOC charge, and eventually filed suit. The district court dismissed her complaint as untimely under the 180 day rule, presumably on the ground that a union contract purportedly remedying the discrimination was signed more than 180 days before plaintiff filed her EEOC charge.

■ The Fifth Circuit reversed. The court held that plaintiff had properly alleged a continuing violation during the entire ten year period, to within 180 days of when she filed her EEOC charge. Here, similarly, plaintiff claims that defendant discriminated against her in pay during her two years of teaching, a violation that was continuing when she filed her EEOC charge in February of 1977. Plaintiff did, therefore, comply with the 180 day rule, and neither of her claims for salary discrimination are time–barred under Title VII.

Defendant's reliance on *Bickham v. Miller*, 584 F.2d 736 (5th Cir. 1978), *Krzyzewski v. Metropolitan Government*, 584 F.2d 802 (6th Cir. 1978), and *NLRB v. California School of Professional Psychology*, 583 F.2d 1099 (9th Cir. 1978) is misplaced. In each of the first two cases, *Bickham* and *Krzyzewski*, the act of discrimination was discrete in time, rather than continuing (*Bickham* –denial of promotion; *Krzyzewski* –discharge). The *California School* case was a labor case, and the court specifically noted that unfair labor practice cases are handled differently from Title VII cases (it was also a discharge case, making it inapposite to our case).

■ While it is unclear whether defendant argues that plaintiff's claim for discriminatory discharge is time–barred, it is not. Plaintiff filed her charge with the EEOC within 180 days of the date on which Dillard notified her that her contract would not be renewed, and well *before* her last day of employment. *Cf. Ricks v. Delaware State College*, 605 F.2d 710 (3d Cir. 1979) (charge filed after 180 days from notification but within 180 days of last date of employment; relevant date is last date of employment); *Egelston v. State University College*, 535 F.2d 752 (2d Cir. 1976) (charge filed after 180 days from notification but *before* last date of employment; relevant date may even be when replacement is hired for Title VII purposes); *Ottaviani v. State University*, 19 E.P.D. ¶ 9199 (S.D.N.Y. 1979) (same as *Egelston*, following its ruling). Plaintiff here also filed suit in this court within 90 days of issuance of the right–to–sue letter, in accordance with the statute. *See* 42 U.S.C. § 2000e–5(f) (1976).

■ The burden for plaintiff's section 1981 claim is somewhat harsher, but she satisfied the restrictions of that statute as well. In *Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975), the Supreme Court ruled that filing an EEOC charge does not toll the statute of limitations for section 1981 claims. Because the statute of limitations for a civil rights action adopts the relevant state statute of limitations, plaintiff in this case must have filed suit within one year of the unlawful practice. *See Johnson v. Goodyear Tire & Rubber Co.*, 491 F.2d 1364, 1379 n.49 (5th Cir. 1974); La.Civ. Code Ann. art. 3534 (West 1953). Plaintiff did, in fact, file suit within one year of the date of notification of her termination and well within one year of her last date of employment. As respects the salary discrimination, she is at least entitled to relief for wage discrimination under section 1981 for the one year preceding the filing of suit. *See Bernard v. Gulf Oil Co.*, 596 F.2d 1249 (5th Cir. 1979) (continuing violation theory applies to § 1981 claims).

## III. FISHER'S TERMINATION

The U.S. Fifth Circuit Court of Appeals recently outlined the law applicable to discriminatory discharge cases in *Whiting v. Jackson State University*, 616 F.2d 116 (1980), a Title VII section 1981 case factually similar to the present case. In *Whiting*, Jackson State University, a predominantly black school, hired plaintiff, a white person, as a psychometrist under a one–year contract. The school renewed plaintiff's contract the next year, but in the middle of the year notified him that he was suspended without pay and his contract would not be renewed for the following year. Plaintiff eventually filed suit in district court alleging that he was the victim of a racially discriminatory discharge. The *Whiting* case was tried to a jury that returned a verdict in his favor for unpaid salary with interest, a reasonable attorney's fee, and costs. Affirming the district court's final judgment on the jury's verdict, the Fifth

Circuit reviewed the order of proof and relevant legal standards and found that the jury could have reasonably reached its verdict on the evidence presented.

█ In accordance with the standards outlined in *Whiting*, the plaintiff must carry the initial burden of establishing a prima facie case of racial discrimination by showing: (1) she belongs to a group protected by Title VII;[2] (2) she was qualified for her teaching position; (3) she was terminated; and (4) after her termination, Dillard hired a person not in her protected class, or retained persons with comparable or lesser qualifications not in her protected class. 616 F.2d at 121; *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 & n.13, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973).

As in *Whiting*, plaintiff here satisfies the first step of the prima facie case because she is white, she was employed by a predominantly black institution, and race is an impermissible employment consideration.[3] *See* 616 F.2d at 123; *accord, McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976) (Title VII prohibits discrimination against whites). Defendant did not contest whether plaintiff was qualified for her job. Plaintiff holds the Ph.D. degree in her chosen teaching field from a respected school. Dillard renewed Fisher's contract after her first year of teaching, and her division chairperson remarked on Fisher's first–year evaluation that "Dr. Fisher is very competent in her subject area. She is well–organized." In fact, Reynolds' evaluation comments indicated:

[Fisher] has been an excellent addition to the psychology department. She has spent considerable amount of time counseling students and working with individuals and groups to help them develop cognitive skills necessary for academic success in psychology.

Plaintiff was also well–regarded as a teacher by her colleagues in the psychology department, Dr. Lyles and, later, Dr. Jones.

In 1976, Fisher applied for and was awarded a National Science Foundation grant to fund an experimental project. This was the first such grant awarded to a member of the Division of Education faculty in Dillard's history. Thus, plaintiff showed significant promise of research and writing in her teaching field, which the evidence showed is a measure of academic quality. I conclude from all of the evidence that plaintiff was qualified for her position.

As in *Whiting*, termination is obvious. Failure to renew a contract is tantamount to discharge. 616 F.2d at 123 & n.6. Later, after plaintiff was informed her contract would not be renewed, Dillard offered to renew the contract of Jones. Jones also held the Ph.D. degree but had been teaching at Dillard only slightly longer than one semester at the time. Like Fisher, Jones was hired directly out of her Ph.D. program. Thus, Dillard intended to retain a black teacher with qualifications comparable to Fisher's.

I do not find it significant that Jones' specialty was clinical psychology, while plaintiff's area was experimental psychology. Also, while Jones did more graduate level teaching as part of her Ph.D. program than Fisher, the evidence showed that pre–doctorate teaching experience is normally not taken into significant account in comparing professors. If anything, then, Fisher was the more experienced professor with correspondingly better credentials.

Moreover, when Dr. Jones decided not to return to Dillard, the school hired two black psychology professors, Drs. Armond A. Devezin and Yvonne R. Bell. One of them presumably filled the vacancy left by Fisher. Neither was from plaintiff's protected class. By two measures, therefore, plaintiff satisfied the final *Whiting* criterion.

2.  When 42 U.S.C. § 1981 is used as a companion remedy provision to section 706 of Title VII, the elements of the case and the inference of discriminatory intent are proven in the same manner under both sections. *Whiting*, 616 F.2d at 121.

3.  I also note that all three individuals involved in the decision to terminate plaintiff, Cook, Thompson, and Reynolds, are black.

In sum, I find that plaintiff established a prima facie case that her termination was based on racial discrimination under both Title VII and section 1981.[4] Once the plaintiff establishes a prima facie case, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the termination. The employer is not required to prove the absence of discriminatory motive, but the law in this circuit requires that the employer prove nondiscriminatory reasons by a preponderance of the evidence. *Whiting*, 616 F.2d at 121. That is, the employer must do more than merely state fictitious reasons: *legally sufficient* proof is needed before I can find plaintiff's proof rebutted. *Burdine v. Texas Department of Community Affairs*, 608 F.2d 563, 567 (5th Cir. 1979) (emphasis in original).

If the employer does rebut the plaintiff's prima facie case, the plaintiff is still given an opportunity to establish that the employer's asserted reasons are a pretext for a racially discriminatory decision. Ultimately, the burden of persuasion is on the plaintiff, who must establish racial discrimination by a preponderance of the evidence. *Whiting*, 616 F.2d at 121.

I find that defendant in this case did not successfully rebut plaintiff's prima facie case that her termination was racially motivated. Ordinarily, then, I would not reach plaintiff's other evidence of pretext. Nevertheless, I also specifically find that if there was some validity to Dillard's asserted reasons, plaintiff proved that they were a pretext for a decision based on race.

Plaintiff was terminated on the recommendations of Dr. Reynolds, the Division Chairperson, and Dr. Thompson, Vice President for Academic Affairs. Both Reynolds and Thompson testified that the primary factor leading to their decisions to recommend termination was student complaints. Reynolds testified that students specifically complained about plaintiff's teaching technique and her grading. As to grading, Reynolds testified that she told plaintiff to explain her policy to students at the beginning of each semester; she did not suggest that plaintiff change her grading policy. Plaintiff testified that she did follow Reynolds' suggestion, while Reynolds admitted that she did not follow-up to see whether plaintiff had followed her advice. Former students testified that those students who were critical of plaintiff's grading complained only that she was a tough grader, not that she was unfair.

The biggest source of criticism among students was apparently plaintiff's teaching technique. Fisher introduced at Dillard a self-paced, individualized study method called "modular study" or "competency-based" teaching. This type of teaching did not depend on the usual lecture study method. Two former students testified that plaintiff's teaching method was unsatisfactory for them and made Fisher unpopular with other students. Yet, Reynolds' testimony painted a picture of student dissatisfaction stemming only from confusion and apprehension upon being confronted with the new non-traditional teaching method. On plaintiff's first year evaluation, under "Service", Reynolds wrote, "(Innovative) She initiated an individualized program in teaching courses in psychology which proved to be very effective in helping students learn how to learn and to be responsible for their own learning."

Indeed, at that very time, Reynolds was attempting to introduce a competency-based teaching program throughout the Division of Education as an improvement on traditional teaching techniques, and Lyles used the same method of teaching. Both Reynolds and Thompson testified that plaintiff expressed considerable hostility to the introduction of the program throughout the division.[5] Nevertheless, each admitted that the new program was completely consistent with plaintiff's own teaching philos-

4. See note 2, *supra*.

5. Reynolds' letter recommending plaintiff's termination charged, "At the beginning of the 1976 school term Dr. Fisher began using various tactics to undermine the Division in its efforts to develop a competency-based program."

ophy. More credible to explain plaintiff's hostility was the testimony of Dr. Jones. She remembered that Fisher had objected when salaries from federal funds for writing and developing the proposal were paid to only Reynolds and Jones. According to Jones, the only other remarks she heard from plaintiff that could be interpreted as "hostile" consisted of astute constructively critical observations about the new program, with which Jones in fact agreed.

Thompson was especially emphatic that students began to complain to him shortly after plaintiff began teaching and continued to complain throughout her tenure. He was sure that he received more complaints about Fisher than any other professor. Yet, neither Thompson nor Reynolds was able to document a single conversation with a student or even to estimate the number of complaints or name a complaining student. The former students called by defendant to testify to plaintiff's inadequacy as a teacher admitted that they expressed their opinions to no one in the administration. In fact, one of the students was a signatory to a report to the administration on behalf of Dillard psychology majors that was highly critical of the school's treatment of the department, including non–renewal of plaintiff's contract.

Other former students testified that plaintiff was an excellent instructor, and Lyles observed that Fisher's relationship with her students was good. Plaintiff testified that the complaints she received were the usual student gripes about too many papers or a test scheduled on a certain day. Plaintiff admitted that many students initially complained that they were not given enough time to finish their tests, but she corrected this problem, she felt, and the complaints ceased. Student evaluations confirm that although students on the whole felt that plaintiff's courses were difficult, they also felt they learned a great deal from her.

The other major factor cited by Reynolds and Thompson as underlying their recommendations was a "negative attitude" on the part of plaintiff concerning Dillard, its students, and campus activities. They detailed a history of lack of enthusiasm, hostility toward and lack of understanding of Dillard's less–prepared and disadvantaged students, encouraging students to leave Dillard, failure to counsel students, preoccupation with research rather than students, opposition to the psychology department's placement in the Division of Education, missed faculty meetings, unauthorized outside employment, and an exam given during a University convocation. Testimony by former students, fellow professors, and plaintiff herself belied or discredited all of the accusations.

Also worthy of note is the timing of all of the events. Reynolds and Thompson testified that complaints began immediately upon plaintiff's arrival at Dillard, yet Reynolds' evaluation at the end of the first year was glowing in its praise. Thompson's first year evaluation was less positive, but he admitted that he never visited any of plaintiff's classes. Only one semester later, Reynolds wrote her letter scathing in its criticism of Fisher and recommending her termination, and Thompson concurred. In addition, Reynolds testified that she discussed student dissatisfaction with Fisher but never counseled Fisher to change her teaching presentation or personal attitude. Thompson claimed that he had two interviews with Fisher at which he perceived a negative attitude in general, although he also did not counsel plaintiff about her alleged deficiencies. It is difficult to believe that Dillard personnel would not have attempted to steer Fisher in the right direction before undertaking the drastic step of discharging her. This would seem to be especially true considering plaintiff's apparently not–unsuccessful first year and her valuable contribution to Dillard in the form of the soon–to–be–received NSF grant funds.

■ In sum, I found that Dr. Reynolds' testimony was of questionable credibility, and Dr. Thompson lacked credibility entirely. In contrast, I found plaintiff to be a highly creditable witness. The EEOC's determination recited, "It is clear from the

evidence presented that any guidelines which [Dillard] maintains on contract renewals are at best nebulous and have indeed been applied in a highly subjective, unequal manner without benefit of notice." I concur and find even further that defendant did not articulate any legitimate, non-discriminatory reason for plaintiff's termination. Plaintiff even showed that some of the reasons advanced to support the decision not to renew her contract were manufactured after the decision had already been made, some out of circumstances that arose only after the fact.[6] Plaintiff established by a preponderance of the evidence that Dillard violated Title VII and section 1981 when it did not renew her contract because of her race.

Plaintiff presented extensive testimony from former Dillard teachers to support her allegation of discrimination with evidence of other similar incidents. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 804–05, 93 S.Ct. 1817, 1825, 36 L.Ed.2d 668 (1973). I found the demonstration persuasive. Even if I had credited defendant's "articulated reasons" with some validity, cumulating all of the evidence, I find that plaintiff rebutted the defense by showing that the reasons advanced were merely a pretext for a racially discriminatory decision.

## IV. SALARY DISCRIMINATION

Plaintiff's contract for her first year of teaching at Dillard (1975–76) called for a salary of $13,500. Plaintiff testified that she was told by Reynolds upon applying for the position that the job paid between $12,000 and $14,000. Reynolds told her to ask for $14,000 and she would get $13,500, which she should accept. Plaintiff's testimony was uncontradicted. At the same time, Lyles was in her second year of teaching at a salary of $16,000, after receiving $15,500 for her first year (1974–75).

Plaintiff was offered a raise to $13,905 for her second year of teaching (1976–77). She was unhappy with the small amount of the raise and wrote Dr. Cook asking for a further increase. Cook wrote plaintiff that an adjustment could not be made. At the same time, Dillard offered to hire Jones at a salary of $13,000 for her first year of teaching. Jones rejected the offer because the salary was too low. Thereupon, Dillard hired Jones at a salary of $16,000.

Dillard did not seriously dispute that Lyles, Fisher and Jones performed substantially the same job. Each was hired directly out of a Ph.D. program as an Assistant Professor in Education. All three were full-time teachers, and, although they taught different classes, carried full class-hour loads in the psychology department. All three were expected to hold regular office hours for counseling. Obviously the disparity in salaries between plaintiff, who is white, and her two black counterparts cannot be explained on the basis of time employed at Dillard, pre–Dillard experience,[7] or level of education. Thus, a prima facie case of wage discrimination on the basis of race was shown. *See Sledge v. J. P. Stevens & Co.,* 10 E.P.D. ¶ 10,585 (E.D.N.C.1975), *rev'd in part, aff'd on particular issue,* 585 F.2d 625 (4th Cir. 1978), *cert. denied,* 440 U.S. 981, 99 S.Ct. 1789, 60 L.Ed.2d 241 (1979).

Statistical evidence in Title VII cases can be given great weight. *See Pettway v. American Cast Iron Pipe Co.,* 494 F.2d 211 (5th Cir. 1974). Plaintiff supplemented the showing in her individual case with data showing salaries of all white and black teachers at Dillard. The chart reproduced below was a part of the evidence:

---

**6.** The circumstances surrounding plaintiff's proctoring an exam during a University event were memorialized in a memorandum that was not written until after plaintiff filed her complaint with the EEOC. Moreover, the testimony showed that plaintiff missed no faculty meetings and took no outside employment until the second semester of her second year.

**7.** As discussed earlier, Jones did more graduate level teaching while in her Ph.D. program than Fisher. Nevertheless, uncontradicted expert testimony indicated that absent unusual circumstances, such as extensive college–level teaching with a master's degree, pre-doctorate teaching is not taken into significant account in comparing professors.

## INSTRUCTORS

| Degree | Race | Number in group | Average years teaching at Dillard | Average salary [8] | Median salary [9] |
|---|---|---|---|---|---|
| B.A. | Black | 4 | 3.0 | $ 9,442.75 | $ 9,050.00 |
| B.A. | White | 0 | --- | -------- | -------- |
| M.A. | Black | 12 | 4.3 | 10,942.92 | 10,637.50 |
| M.A. | White | 4 | 4.0 | 10,750.50 | 10,705.50 |
| TOTAL | Black | 16 | | $10,567.88 | |
| | White | 4 | | 10,750.50 | |

## ASSISTANT PROFESSORS

| Degree | Race | Number in group | Average years teaching at Dillard | Average salary | Median salary |
|---|---|---|---|---|---|
| M.A. | Black | 15 | 5.0 | $12,752.40 | $12,979.00 |
| M.A. | White | 4 | 8.0 | 11,244.50 | 11,086.00 |
| Ph.D. | Black | 5 | 1.2 | 14,980.80 | 15,179.00 |
| Ph.D. | White | 5 | 4.8 | 13,068.80 | 13,520.00 |
| TOTAL | Black | 20 | | $13,305.50 | |
| | White | 9 | | 12,258.00 | |

## ASSOCIATE PROFESSORS

| Degree | Race | Number in group | Average years teaching at Dillard | Average salary | Median salary |
|---|---|---|---|---|---|
| M.A. | Black | 6 | 14.1 | $13,577.83 | $13,166.50 |
| M.A. | White | 0 | --- | -------- | -------- |
| Ph.D. | Black | 8 | 4.25 | 17,082.88 | 17,295.00 |
| Ph.D. | White | 5 | 9.6 | 15,042.60 | 14,675.00 |
| TOTAL | Black | 14 | | $15,580.71 | |
| | White | 5 | | 15,042.60 | |

## PROFESSORS

| Degree | Race | Number in group | Average years teaching at Dillard | Average salary | Median salary |
|---|---|---|---|---|---|
| Ph.D. | Black | 3 | 13.3 | $19,471.00 | $18,743.00 |
| Ph.D. | White | 3 | 9.0 | 16,949.00 | 15,397.00 |

---

Dillard introduced a counter exhibit that reproduced only the "totals" indicated above, and it eliminated the salaries of division chairpersons and other teachers earning extra for administrative duties.[10] Because almost all of these eliminated positions were held by blacks, the difference between the average salaries for total black and white teachers in each rank were reduced to a minimum (the median would be unaffected, see note 9). I find that Dillard's exhibit does not present a realistic picture of salaries although it accounts for differences based on teaching rank, because

8. Average salary indicates the "mean" or "arithmetic average", computed by adding the salaries of all teachers in the particular group and dividing the sum by the number of teachers in the group.

9. The median salary is the salary of the teacher in the middle of the group, e. g., the fifth teacher in a total group of nine. The median is unaffected by an unusually high or low salary earned by one teacher in the group, while the average will be "pulled" up or down accordingly.

it does not account for differences based on degree, and it does not indicate years of service at Dillard.[11]

Plaintiff's exhibit may be considered somewhat misleading because it includes the salaries of those given extra compensation for non–teaching duties. On the other hand, because almost all of these positions are held by blacks, that is an indication in itself that blacks are more likely to get favorable salary consideration. Regardless, plaintiff recomputed the average salaries after eliminating the same positions and presented the following data:

Full professor category remained the same.

| | | |
|---|---|---|
| Associate professor: | Black Ph.D. | White Ph.D. |
| Average: | $15,598 | $14,503 |
| Assistant professor: | Black M.A. | White M.A. |
| Average: | $12,489 | $11,244 |
| | Black Ph.D. | White Ph.D. |
| Average: | $14,476 | $13,069 |

Defendant attacks the validity of plaintiff's survey on the grounds that it represents only a very small statistical sample. *See Williams v. Tallahassee Motors, Inc.*, 607 F.2d 689 (5th Cir. 1979). But this is not a case in which a particular hiring pattern is compared with the general population to try to show disparate impact. These figures speak for themselves. *See generally* D. Baldus & J. Cole, Statistical Proof of Discrimination (1980). Accepting either of plaintiff's sets of data, blacks at Dillard

earn significantly higher salaries than their white counterparts.

Dillard presented testimony as to the "greater productivity" of black full professors as opposed to white full professors, but that still did not account for the disparities in the other categories. Dillard also presented evidence as to the qualifications of Lyles and Jones for teaching disadvantaged blacks to justify their greater salaries. Fisher also had experience teaching disadvantaged blacks that defendant tried to minimize.

■ Dillard's major defense was that various circumstances gave Lyles and Jones the ability to bargain for higher salaries, and they did bargain when Fisher did not. When Fisher attempted to bargain over her salary in her second year, however, she was rebuffed. In Equal Pay Act cases involving sex discrimination, greater bargaining power of men over women is rejected as a proper justification for discrimination. *E. g., Hodgson v. Brookhaven General Hospital*, 436 F.2d 719, 726 (5th Cir. 1970) (male orderlies v. female nurse's aides); *Brennan v. City Stores, Inc.*, 479 F.2d 235, 241 n.12 (5th Cir. 1973) (salesmen and male tailors v. saleswomen and seamstresses).[12] The fact that there are few black Ph.D.'s in psychology in the country does not justify paying

---

**10.** Dillard's exhibit is reproduced below:

COMPARISON OF FACULTY SALARIES
BY RACE*
1977–78

| RANK | BLACK | | WHITE | |
|---|---|---|---|---|
| | No. | Avg. Salary | No. | Avg. Salary |
| Instructor | 15 | 10,684 | 4 | 10,750 |
| Assistant Professor | 18 | 12,930 | 9 | 12,257 |
| Associate Professor | 10 | 14,345 | 5 | 14,682 |
| Professor | 2 | 18,457 | 3 | 16,049 |

* Salaries of Chairpersons, Area Coordinator, Director of Skills Development Center, and University Organist are not included in these calculations.

**11.** Dillard's exhibit unjustifiably minimizes the difference in salaries between whites and blacks because in each rank, a larger percentage of blacks hold degrees inferior to those of their white counterparts. Mixing those holding different degrees, then, disproportionately pulls down the averages for black teachers in each rank.

**12.** The Fifth Circuit has ruled that the sex discrimination provision of Title VII must be construed in harmony with the provisions of the Equal Pay Act, 24 U.S.C. § 206(d), relating to justified discrimination. *E. g., Orr v. Frank R. MacNeill & Son, Inc.*, 511 F.2d 166 (5th Cir.), *cert. denied*, 423 U.S. 865, 96 S.Ct. 125, 46 L.Ed.2d 94 (1975). Unlike race, however, Title VII as it relates to sex discrimination specifically states that no violation will be found if dis-

them substantially more than their white counterparts.

It is similarly irrelevant what either Lyles or Jones is making now in the private sector. Expert testimony showed that school and clinical psychologists like Lyles and Jones may make more in the private sector than experimental psychologists, but in the academic setting there should be no difference in salary.

■ Overall, in spite of the justifications asserted by defendant, I was convinced that all the reasons advanced to explain the differences in salary between plaintiff and her black counterparts were fictitious. Her case of individual discrimination was compelling, especially in light of the University–wide statistics. I find that plaintiff showed that for both years that she was employed at Dillard, defendant paid her less because of her race.

## V. RELIEF

### A. Declaratory Judgment

■ A declaratory judgment in a civil rights case may be appropriate in addition to injunctive relief or damages. *See, e. g., Evers v. Dwyer,* 358 U.S. 202, 79 S.Ct. 178, 3 L.Ed.2d 222 (1958); *Willie v. Harris County,* 202 F.Supp. 549 (S.D.Tex.1962). Declaratory relief may be proper even where a comprehensive statutory scheme of remedies is provided for a specific type of claim, such as a Title VII/section 1981 claim. *See Marchwinski v. Oliver Tyrone Corp.,* 461 F.Supp. 160, 173 (W.D.Pa.1978). Normally a declaratory judgment is not appropriate, however, unless there is some likelihood of the recurrence of the alleged discriminatory policy. *See Wright v. St. John's Hospital,* 414 F.Supp. 1202 (N.D.Okl.1976). In this case, plaintiff does not seek reinstatement or represent a class of teachers at Dillard,

so any further acts of discrimination will not affect the controversy presented in this case.

■ On the other hand, an actual controversy did exist between plaintiff and defendant sufficient to adjudicate this case. Because of the relatively closed nature of the academic community and the reasons given by defendant for terminating plaintiff, her opportunities for future employment may be jeopardized. I find that a declaratory judgment is therefore appropriately entered here. 28 U.S.C. § 2201 (1976); Fed.R.Civ.P. 57.

### B. Monetary Damages

■ Plaintiff is entitled to back pay to compensate her for wages lost as a result of defendant's discriminatory actions. 42 U.S.C. § 2000e–5(g) (1976); 42 U.S.C. § 1981; *Pettway v. American Cast Iron Pipe Co.,* 494 F.2d 211, 263 (5th Cir. 1974). Absent discrimination, plaintiff would have earned in her two years at Dillard at least what her black counterpart, Dr. Lyles, earned in first and second years. Fisher is entitled to the difference between her salary and Lyles' first and second year salaries. Absent discrimination plaintiff would have earned in her third year at least what Dr. Jones was offered for her second year. Fisher is entitled to the difference between what she actually earned in alternative employment and Jones' proposed second year salary.

If Fisher had not been terminated, she would have received additional compensation from the NSF grant in the summer of 1977 and in the summer after her third year in 1978. Job–related monetary benefits in addition to salary are recoverable in a Title VII/section 1981 case. *E. g., Pettway,* 494 F.2d at 263 (interest, overtime, shift differentials, and fringe benefits such as vacation

---

crimination is justifiable under the Equal Pay Act, 29 U.S.C. § 206(d). 42 U.S.C. § 2000e–2(h) (1976). On the other hand, if discrimination on the basis of sex is *unjustifiable* under the Equal Pay Act, and thus Title VII, for a particular

asserted reason, such as "bargaining power", it should be similarly unjustifiable to discriminate on the basis of race given the same asserted reason.

and sick pay; adjustment to pension plan for since–retired members of class); *Bowe v. Colgate, Palmolive Co.*, 489 F.2d 896 (7th Cir. 1973) (vacation, sick pay, bonus). Although the funds to pay Fisher's summer salary would not have come from defendant, Dillard was anxious to receive the NSF grant. Cook accepted the grant on behalf of the University and even approached Jones about taking over the project after Fisher had been terminated. In the interest of making plaintiff whole, she should be awarded damages to compensate her for this lost income. *See Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418–425, 95 S.Ct. 2362, 2372, 2375, 45 L.Ed.2d 280 (1975). Similarly, I also award prejudgment interest from the dates the income would have been received. *See Illinois Central Railroad Co. v. Texas Eastern Transmission Corp.*, 551 F.2d 943 (5th Cir. 1977); *Pettway*, 494 F.2d at 263; *Inda v. United Air Lines, Inc.*, 405 F.Supp. 426, 435 (N.D.Cal.1975).

Compensatory damages are recoverable under section 1981 for racial discrimination in private employment. *See Garner v. Giarrusso*, 571 F.2d 1330, 1338 (5th Cir. 1978). Plaintiff is entitled to an award for injury to reputation, physical, and mental health as a result of the discriminatory discharge. *See Simineo v. School District No. 16*, 594 F.2d 1353 (10th Cir. 1979). Finding that defendant deliberately violated plaintiff's constitutional rights, I also award punitive damages. A reasonable attorney's fee will be allowed pursuant to 42 U.S.C. § 1988 and 42 U.S.C. § 2000e–5(k) (1976). *Whiting v. Jackson State University*, 616 F.2d 116 (5th Cir. 1980).

In light of the foregoing,

IT IS ORDERED that judgment be entered,

(1) Declaring that plaintiff while employed by defendant was paid less than comparable black teachers because of her race in violation of Titles VI and VII of the Civil Rights Act of 1964 and the Civil Rights Act of 1870;

(2) Declaring that plaintiff was terminated by defendant because of her race in violation of Titles VI and VII of the Civil Rights Act of 1964 and the Civil Rights Act of 1870;

(3) Awarding plaintiff damages against defendant in the amount of $11,127 for back pay, with legal interest on $2,000 from August 1, 1976, on $5,095 from August 1, 1977, and on $4,032 from August 1, 1978;

(4) Awarding plaintiff compensatory damages against defendant in the amount of $50,000 and exemplary damages in the amount of $10,000;

(5) Attorneys fees and costs are assessed against defendant.

IT IS FURTHER ORDERED that plaintiff's attorney prepare a schedule of fees for preparing this case, which the court will use to evaluate a reasonable attorney's fee under the standards outlined in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974).