**Carolyn Burke SNOW, Plaintiff,**

v.

**NEVADA DEPARTMENT OF PRISONS, Charles L. Wolff, Jr., and Boyd Marsing, each of them are sued in both their official and individual capacities as agents and employees of the State of Nevada Department of Prisons, Defendants.**

No. CV–R–78–101–ECR.

United States District Court,
D. Nevada.

Jan. 30, 1984.

See also D.C., 543 F.Supp. 752.

Charles R. Zeh, Washoe Legal Services, Sparks, Nev., for plaintiff.

Robert List, Atty. Gen., Carson City, Nev., for defendants.

## MEMORANDUM DECISION AND ORDER

EDWARD C. REED, Jr., District Judge.

Nevada was one of the first states to hire female correctional officers with the intention of fully integrating them into the prison system so that they would be able to perform virtually all tasks of such officers.

On July 1, 1975, plaintiff was hired by the Nevada Department of Prisons (DOP) as a correctional officer. She was a member of the first group of female correctional officers hired by the State of Nevada.

Prior to July 1, 1975, the date on which female correctional officers were first hired by the State, women were not allowed to even enter many of the areas within the prison system, let alone to be employed there as correctional officers.

The leadership of the prison system, during the period of time which is the subject of this action, included Warden (the name of this position was later changed to Director) Ed Pogue and his successor, Director Charles W. Wolff, a defendant herein. Director Wolff succeeded Mr. Pogue on July 31, 1976. Other high level supervisors involved in this case included Norman Snellgrove and Boyd Marsing, who is a defendant in this case, both of whom were superintendents (wardens) at the Nevada State Prison (NSP) at various periods of time, and Bea Franklin, Superintendent of the Nevada Women's Correctional Center (Women's).

Affirmative action plans for women and minorities were first developed in 1975 and strong efforts were made by the leaders of the prison system, including Warden Pogue and Director Wolff, to carry out the policies of the programs adopted. The number of female employees in DOP dramatically increased by 135% between 1976 and 1979.

Nevertheless, the integration of women into the correctional system in Nevada proved to be a laborious and difficult process. At first, the prison officials were uncertain whether women could safely perform all of the duties of correctional officers, and it was through a process of trial and error, and learning and study, that it was found that women could indeed competently perform all such tasks.

It was also necessary to train and indoctrinate the all-male staff which was then in place. Some of these staff members had expressed beliefs such as, "prisons are no place for women." Other officers were reluctant to recognize the status of the newly-hired women as full-fledged correctional officers, and if the women officers questioned practices or were otherwise assertive they were sometimes ostracized by the rest of the staff. So far as this group of male officers was concerned, if rules were broken by the women officers, such occurrences were more likely to be documented than was the case with male officers. While most of the correctional staff was receptive to affirmative action and to the employment of women, some staff members manifested their opposition to the employment of women officers by engaging in sexual harrassment and sex discrimination.

It was through this changing period in corrections in 1975–6 that plaintiff worked for the Nevada Department of Prisons as a correctional officer. She was one of the pioneers of women in corrections. Plaintiff

herself was highly sensitive to discrimination and did not hesitate to bring to the attention of her co-workers and superiors practices she felt were discriminatory. This she accomplished by word of mouth, memoranda and by the filing of complaints with the Nevada Equal Rights Commission and the Equal Employment Opportunity Commission. She was a worthy pioneer in the field because it must be concluded that, through her efforts and what happened to her, conditions for female employees in the prison system have been considerably improved. The evidence admitted in this case indicates that now, for the most part, women are accepted as full partners on the staffs on which they serve. This is not to conclude that all discrimination has necessarily been eradicated in the system. The focus of this case is, of course, limited to the experiences of plaintiff and the institutions in which she served. Thus, the conclusion mentioned must be limited to the facts of this case.

Plaintiff was first employed at Northern Nevada Correctional Center (Medium), a medium security prison. There she received the in-service training course as a correctional officer which is conducted by the prison staff to train newly hired officers.

In addition to on-the-job training (OJT), which all officers are given as they work in their assignments, they receive, upon being employed, an in-service training course of two weeks. This includes lectures, weapons training and tours of facilities. OJT essentially consists of experienced officers training new employees on work assignments, first by demonstrating how the various procedures are required to be carried out and then by observing the new employees, while they perform these same tasks. Considerable attention is shown by the more experienced officers in training the new officers. To some extent this must be attributed to the fact that the safety of all the officers in the prison depends on each officer properly understanding and performing the assigned duties.

In the course of the training of the first class of women correctional officers (which included plaintiff), there was some discrimination practiced against them. They were not allowed to go to all parts of the prisons and were required to have a male officer escort them to other parts of the institutions. The first women correctional officers were not permitted to undertake all duties and assignments allowed to male officers. Over a period of a year or two these wrongs were righted, however, and to quite an extent because of the many various complaints and objections lodged by plaintiff. There is no evidence of any out-of-pocket damages incurred by plaintiff because of these violations of the law. She did not suffer loss of any pay nor opportunity or chances for promotion. It does not appear that her career was affected adversely by these occurrences, as compared to what happened to the male officers in like circumstances.

After completion of her training, plaintiff was assigned to "Control" at Medium. The Control office is a sort of message center where information and orders are received by or within the prison. The officer functioning as Control transmits such information and orders via telephone, loudspeaker, and other means. It is necessary for the officer assigned to Control at Medium to operate the loudspeaker system. Plaintiff refused the assignment to work Control because she has a stutter. This fact was made known by plaintiff, to her superiors, but they denied she had such a problem (contending they had not observed any stutter) and insisted that she perform the duties of Control. She refused the assignment and was then suspended from duty and recommended for termination.

The evidence in the case indicates that in fact plaintiff does have a stuttering problem. While this problem does not appear to be severe, it does appear to be sufficiently serious so that one with such a handicap would at least hesitate to use a loudspeaker on a regular basis.

After the recommendation for plaintiff's termination was received by then Warden

Pogue, he made further inquiry concerning the charges. His final decision resulted in the suspension of plaintiff from duty for a period of three days for refusing to perform the assigned duty. In addition, plaintiff was transferred to Nevada Women's Correctional Center (Women's). Further, she was sent for counselling to Walter Luster, prison mediator and ombudsman. Through Mr. Luster's efforts plaintiff was referred to a psychologist because it was felt that the stuttering might be due to emotional difficulties. This referral was made under a program which had been initiated by the State and was called the Occupational Assistance Program (OAP). Plaintiff fully cooperated in OAP and, in December of 1976, was given a clean bill of health as fully qualified from a psychological standpoint to perform all duties in the prison system.

Plaintiff's performance at Women's was at least standard. There was every indication that she performed her duties satisfactorily.

Women's had initiated a progressive penological program called "The Just Community." The staff at Women's was trained in Connecticut to learn its operation. Philosophically, The Just Community involved interaction between inmates and staff and a less formal atmosphere than is found in most prisons. Its goal is for the inmates to help govern themselves. Plaintiff appears to have been receptive to The Just Community concept and to have shown ability to operate within it.

Plaintiff's performance as a correctional officer and her educational background qualified her to take the examination for promotion from Correctional Officer 2 to Correctional Officer 4 (C/O 4), or Senior Correctional Officer. She took the examination and passed it, being ranked third among those examined. Shortly thereafter, she was promoted to probationary C/O 4.

Plaintiff was then transferred to the Nevada State Prison (NSP), a maximum security institution, where the opening existed for a C/O 4. She was first assigned as a correctional officer to "First Watch" which is roughly equivalent to the graveyard shift. There, as a C/O 4, she was second in rank on that watch. In the absence of the sergeant who would normally have been in command of the shift, plaintiff would have been acting watch commander.

There is evidence that the supervisors of First Watch and her fellow officers did not want plaintiff to become watch commander and for that reason she was transferred to Third Watch, the equivalent of the swing shift. The First Watch is the least desirable of the watches and the Third Watch is considered to be a much more desirable watch.

It is asserted by defendants that the reason for the transfer of plaintiff to the Third Watch was to provide her with a broader opportunity for experience, as medical officer for the entire institution, on that watch. The medical officer is charged with distributing medicine to inmates throughout the institution and in the discharge of those duties becomes familiar with virtually all of the areas of the prison and the procedures used in each. The medical officer has a command of sorts, in that she is in charge of a medical technician, junior officers assigned to assist her, and inmate hospital attendants and porters. The medical officer has considerable responsibility, being in full charge of an important function of the institution. It is certainly, however, a lesser assignment than that of a watch commander.

While it is a close question as to why plaintiff was transferred to Third Watch, it does appear to the Court, and the Court finds that this transfer was motivated by sex discrimination. Plaintiff had been with the department for sixteen months at that time. She was fully trained. She had been promoted to C/O 4 which made her ranking officer on First Watch when the Sergeant was not present. According to Captain Pacette's memorandum of 10/20/76 she lacked experience, yet the same memorandum indicates she had been assigned to and worked all positions on First Watch, except watch commander. So, while there were

probably officers on First Watch of lesser rank with more experience, she appears to have had adequate experience to assume the watch commander's position.

Captain Pacette's memoranda of 10/20/76 and 10/13/76 corroborate plaintiff's position that she was transferred because of sex discrimination. These memoranda by Captain Pacette indicate that he and the First Watch staff were essentially concerned (more than with her lack of experience) that a woman might assume command. Plaintiff was insisting on assuming command. To avoid this, Captain Pacette decided to transfer her to the medical officer's position.

■ There is no credible evidence that Director Wolff or Mr. Marsing knew that this act was motivated by sex discrimination, or that they participated directly or indirectly in it. Testimony has shown that they both opposed discrimination based on sex. Therefore, no damages can be assessed against them in respect to the transfer. *See Harris v. City of Roseburg*, 664 F.2d 1121, 1125 (9th Cir.1981). Likewise, plaintiff did not suffer loss of her job or reduction in pay, by reason of the transfer. As a consequence, neither reinstatement nor back pay is available to her here under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., against the State because of these acts. *See Padway v. Palches*, 665 F.2d 965, 968 (9th Cir.1982). Further, other evidence indicates plaintiff was subsequently permitted to act as an "acting" watch sergeant.

Plaintiff requested assignment as an escort officer for certain dangerous prisoners who were being accompanied back and forth from the prison to court. Her request was denied by Lt. True because "female officers are not allowed to conduct body or 'pat' searches of male inmates," (such searches being required when prisoners enter or leave the prison), nor to accompany male prisoners to "head breaks" while at the court house. According to Captain Pacette the policy of NSP at that time was, for these reasons, not to permit

female officers to be part of such escort teams.

Evidence adduced at the trial indicates that policy has since been changed to allow female officers to become part of an escort team. No officer is allowed to conduct pat down searches of prisoners of the opposite sex, or to accompany them to the head. However, since the escort team consists of several officers, the male members of the team perform these duties forbidden to the female officers, and vice versa. There is no credible evidence that Director Wolff or Mr. Marsing participated in any manner in the formulation or implementation of the earlier policy, so they are not liable for damages in this respect. Plaintiff's job was not in any way imperilled by these acts of sex discrimination, so that no tangible relief against the State is available either.

As medical officer for the institution after her transfer from First Watch, one of the areas where plaintiff was required to deliver medication to inmates was C Block. This is the most secure area of NSP. At the time of the occurrences which are the subject of this action, C Block housed the most violent and dangerous inmates in the prison.

Plaintiff testified that she received only one skimpy on-the-job training tour of C Block to learn the procedures related to that area of the prison. However, Sgt. David Burns repeatedly reviewed the key procedures for C Block with plaintiff and was careful to train her so that she understood the key procedures. Sgt. Stacey and Lt. Kruse also trained plaintiff in C Block key procedures. Correctional Officer Mandeville had on one occasion refused to let plaintiff go into C Block in violation of the key procedure.

So far as the evidence in this case is concerned, plaintiff did show she knew the key procedure for C Block by properly entering that part of the institution on many occasions. In fact, plaintiff demonstrated above average knowledge and comprehension of institutional key procedures. On November 5, 1976, plaintiff even wrote a memorandum to Director Wolff suggesting

a change in the general key procedures at Medium to accord with those at NSP.

The preponderance of the evidence is that the C Block key procedure was properly explained to plaintiff and that she understood it, but did not abide by it when she entered C Block on December 18, 1976.

On that date, plaintiff, escorted by female Correctional Officer Robin Franke, was making the rounds delivering medication in accordance with plaintiff's assignment as medical officer. There were fairly elaborate procedures for officers to enter C Block. These procedures consisted essentially of passing through three security doors and of the handling of the keys on a basis so that the key to a particular door did not go inside that door. On this occasion plaintiff and Officer Franke entered through the first two of these security doors (the 99 and 241 doors) and opened the third (the 215 door), all while in possession of all of the keys to all three doors. The most interior of these doors (the 215 door) opened into C Block proper which consisted of two stories of cells in which a large number of inmates were housed.

At the time the 215 door was opened, if an inmate had been at large in C Block, or had held the inside officer hostage, plaintiff and Officer Franke might have been seized and taken hostage. Then all of the keys necessary for inmates outside their cells to pass into the prison yard and into other areas of the prison would have been available. The security of the institution would have been seriously endangered.

At the time plaintiff opened the 215 door and entered C Block she was challenged for her actions by Correctional Officer Burns, who was on duty inside the block, for failing to follow the required key procedure and thereby endangering the security of the prison. The escort officer, Franke, had also advised plaintiff that she was not following required procedure as she entered C Block. Plaintiff told both officers in essence that they didn't know what they were talking about and that she was following the correct procedure.

The so-called key incident became the subject of a report by Officer Burns to Superintendent Marsing, then warden of NSP, who decided that this breach of security was sufficient cause for plaintiff's suspension from duty and possible disciplinary action. He suspended plaintiff from duty by oral order on December 21, 1976. Then on December 23, 1976, Mr. Marsing prepared a memorandum outlining the key procedure violation and formally suspended plaintiff until the matter of possible discipline had been resolved. This memorandum was delivered to plaintiff on the same day, December 23, 1976.

On December 24th, plaintiff telephoned Mr. Marsing and they decided to let the matter go until after Christmas, when they would meet again.

Some time between December 24th and December 27th Director Wolff received the December 23rd memorandum or was orally advised by Mr. Marsing of the complaint against plaintiff, and Marsing's recommendation that she be terminated or demoted. Director Wolff determined that termination for violation of the key procedure would be too severe a penalty, so that plaintiff should not be fired for that offense. However, the exact nature of the discipline to be meted out to plaintiff for her dereliction remained at that time undetermined.

On December 27, 1976, plaintiff and Mr. Marsing met in his office to discuss the situation. During the course of the meeting, Mr. Marsing advised plaintiff that, notwithstanding what was contained in the written memorandum of December 23, 1976, a decision had been made by Director Wolff that she would not be fired for the key incident. Further, he advised her that she was needed at the prison and was to return to duty the next day to assist in supervising the culinary department. She told Mr. Marsing she would not report for duty. Mr. Marsing, as Superintendent of the prison, then gave her a direct order to report for duty on December 28, 1976. Plaintiff again stated that she refused to report for duty as ordered. It is quite

clear that plaintiff disobeyed the direct order of her superior to report for duty.

The operation of the paramilitary type organization, which is used for prison guards, requires obedience to the orders of superior officers so that the prison may function. To allow subordinate officers to disobey direct orders undermines both discipline and morale, and may cause a breakdown in the guard function.

In fact, plaintiff did not appear for duty on December 28, 1976. Nor did she get in touch with Mr. Marsing concerning the situation.

The reasons which plaintiff gives for her refusal of the order to report for duty are that she was confused because the memorandum which had been delivered to her indicated that she was suspended; yet, the verbal order required her to return to duty the next day, in contradiction of the memorandum. She claims she didn't know which order took precedence. But it is rather clear that the later verbal order would control and that plaintiff knew that that was the case. Plaintiff also testified that, according to the work schedule then in effect, December 28th would have been a day off for her. She alleges she was upset by what she perceived as Mr. Marsing's perfidy because of what he had written in the memorandum. She testified she also felt excused from returning to work because Superintendent Marsing did not advise her as to what her rank or pay would be upon resumption of duty. Plaintiff also claimed that she needed additional notice to report for duty in order to get her uniform in order.

However, perhaps more illuminating is plaintiff's testimony that, prior to reporting for duty, it was her desire to get in touch with the State of Nevada Employees Association (SNEA) for advice as to what she should do. It appears that SNEA had been advising her in her employment difficulties with the prison. Plaintiff did contact SNEA, which advised her, in spite of the direct order of the Superintendent of the prison, not to go back to work until the discipline question had been resolved.

One may speculate as to whether she really had a desire to hold this particular position or rather preferred a lawsuit to the job. Perhaps she felt going back to work might prejudice her position relating to the discipline for the key procedure, which was still hanging over her head.

Protecting her position with respect to the pending disciplinary proceedings was not a valid reason to refuse to obey the direct order of the institution Superintendent. Her determination to seek advice from SNEA indicates she was thinking rationally and made a reasoned decision not to report for duty. None of the other excuses offered by plaintiff for failing to report for duty were valid. She was required to report for duty as ordered.

On December 29th the situation was again brought to the attention of Director Wolff, who decided that in view of the refusal of plaintiff to obey the direct order of Superintendent Marsing, she would be terminated. A letter of that date from Director Wolff to plaintiff was prepared for delivery to her. It indicated that she was being terminated not only for refusal to obey a direct order but also on account of the key incident. Director Wolff testified that, while the key incident itself was not sufficient for termination, that incident, when taken together with plaintiff's refusal to obey the direct order was a proper basis for termination.

It appears to the Court and the Court finds that plaintiff did refuse to obey a direct order of the Superintendent of the institution and that such refusal was a proper basis for her dismissal. Plaintiff understood what a direct order was and the consequences of refusing to obey such an order. She had previously been through the Control incident at Medium. There she had been charged with refusing to accept a duty assignment, assigning her as Control officer, and termination had been recommended for her willful disobedience. The direct verbal order by the Superintendent to report for duty was clearcut. Obviously, refusal to obey it carried potentially far greater ramifications than refusal to accept

the assignment to operate the loudspeaker at Medium.

This Court has previously ruled by Memorandum Decision filed June 28, 1982, that under 42 U.S.C. §§ 1983 and 1985, collateral estoppel does apply to bind plaintiff as to the adjudicative facts found by the Hearing Officer in the State personnel hearings in which plaintiff appealed her termination from DOP, (and in the course of which plaintiff's termination was upheld by the Hearing Officer and the State Personnel Department), to wit:

(1) That plaintiff was justifiably terminated for violating the Rules for State Personnel Administration.

(2) That plaintiff's violation of the key procedure endangered the security of the subject institution.

(3) That plaintiff's refusal to return to work was a direct act of insubordination and willful disobedience.

The same Memorandum Decision held that collateral estoppel does not apply to the Title VII claims. Therefore, the effect of the collateral estoppel is that the adjudicative facts mentioned above are binding upon plaintiff so far as the 42 U.S.C. §§ 1983 and 1985 claims against the individual defendants are concerned. This Court, after considering the matter de novo, now makes the same findings with respect to the Title VII claim against DOP.

■ Collateral estoppel or not, however, plaintiff cannot prevail on her § 1985 claim for relief (conspiracy by the defendants to deprive the plaintiff of equal protection of the laws). It is settled that deprivation of a right created by Title VII (employer may not treat an employee less favorably than others because of her sex) may not be the basis for a claim for relief under § 1985. *See Great American Fed. S. & L. Assn. v. Novotny*, 442 U.S. 366, 378, 99 S.Ct. 2345, 2352, 60 L.Ed.2d 957 (1979).

The termination of plaintiff having been justified, plaintiff cannot obtain reinstatement or back pay from the State under Title VII. The fact remains, however, as discussed above, that she (and the other women correctional officers) were discriminated against by DOP until mid-1976. In addition, plaintiff claims that men in like circumstances were not discharged, as was plaintiff, and that male correctional officers were treated more favorably than plaintiff by DOP as to terminations. She alleges that this also constituted sex discrimination.

■ The claims of sex discrimination may be grouped under two headings. First, there were the actions of her co-workers and supervisors in the manner in which she was treated, her training, her assignments, and particularly the Control incident at Medium and her transfer from First Watch to Third Watch. Each of these items has been dealt with above.

The second category of claimed sex discrimination relates to plaintiff's termination because of the key incident and her refusal to obey the direct order of the Superintendent of the prison. This claim of discrimination is founded upon the proposition that other like-situated male employees of the prison were not terminated for comparable offenses but, instead, received lesser discipline. In this connection evidence relating to the following officers and situations were presented at trial:

(a) Director Wolff hired a black chaplain for the Jean, Nevada, prison. This choice was made over a qualified female applicant. The credible evidence is that the black was chosen because a majority of the Jean inmates were black and it was felt he could relate better to them. The black applicant (unlike the female applicant) had prior law enforcement experience and was recommended for the job by the senior prison chaplain.

(b) Superintendent Norman Snellgrove was reprimanded on November 17, 1976, for his performance at NSP. This reprimand from Director Wolff was highly critical of the administration of the prison by Mr. Snellgrove and threatened him with removal if conditions did not improve. It is contended by plaintiff that Mr. Snellgrove's actions endangered the security of the prison. However, a more

accurate reading of the reprimand indicates that it is a criticism of administration. There is no direct accusation of any act endangering the security of the institution.

(c) Correctional Officer Charles Vernon became intoxicated and was consequently incarcerated in the Washoe County Jail in January of 1977, so that he was not able to appear for work on two different days. In violation of the regulations, he failed to call the prison in advance of his absence. He received only a reprimand for his actions. Officer Vernon's derelictions could have endangered the security of the institution. In a sense they were more severe than that of plaintiff because the prison had no advance notice that he was not going to show up. However, he did not disobey a direct order as plaintiff did. The evidence reflects the policy of DOP to be that an employee can be terminated either for not obeying a direct order or for not showing up for work for five days. Mr. Vernon did neither in January 1977.

(d) Correctional Officer William Smith abandoned his post without authorization, during his shift on February 25, 1977. This left the watch short and was found to have endangered the security of the institution. Officer Smith had been with the department for four years and had received above standard ratings. Nevertheless, he was terminated. The above-mentioned dereliction of duty seems more severe than plaintiff's actions. In plaintiff's case the prison staff had advance notice she was not going to be there and a chance to obtain a replacement. Officer Smith left the institution in the lurch, without a full complement of guards in the middle of a shift. However, there is no evidence that Officer Smith ever refused to obey a direct order, and he was fired for his action.

(e) Correctional Officers Albert Wagner, Fred Williams and Thomas Lowe were involved in a shift change on C Block on February 14, 1981. They failed to check to see that all inmates were in their cells. As it turned out, the tier runners had not been locked in. The result was that the security of the institution was endangered. Each of the three officers received a reprimand. It is not entirely clear as to why the punishment meted out was so limited. However, it appears that the officers' respective responsibilities were not clear cut. None of the officers was accused of disobeying a direct order.

(f) Correctional Officer Larry Wood was involved in a situation where inmates Pat McKenna and David Wayne took a number of officers and prison employees hostage. Officer Wood had been assigned to inspect a shower and failed to locate a gun used by inmate McKenna in the hostage-taking incident. That same evening Officer Wood also had been observed periodically watching television. A letter of reprimand from Director Wolff was made a part of his personnel file. His dereliction did endanger the security of the institution, but his television watching was not found to have made possible the hostage incident. At no time did Officer Wood fail to obey a direct order.

(g) Sgt. Ray Wicker reported to duty intoxicated. Sgt. Wicker had previously had an excellent record with the institution with above standard evaluations. The evening prior to the subject incident he had received word that his brother was in the hospital with terminal cancer. Sgt. Wicker was reprimanded and suspended from duty without pay for four calendar days. His dereliction was a serious one and can be deemed to have endangered the security of the institution. His previous record was superior to that of plaintiff and he had a longer period of service. At no time did he refuse to obey a direct order of a superior officer.

Defendants presented evidence indicating that in the year 1978 five correctional officers were terminated for failure to report to work and that in 1979, of a total of eleven terminations, nine were because of the failure to report to work. Keith Swear-

ingen, an employee of DOP, testified the failure of an officer to report for work for a period of five days is a cause for termination.

The Court cannot conclude that the failure to report for work at NSP is always a ground for termination even though such failure may result in endangering the security of the institution. The charge against plaintiff of endangering the security of the institution in the key incident of itself may be more serious than a failure to report for work, because it resulted in keys being brought into C Block which might have enabled prisoners to virtually take over the institution.

The other charge against plaintiff is that she refused to obey a direct order to return to work. The testimony received at the trial of this case leaves some question as to whether it was a clear cut practice of the institution to discharge officers for failure to obey the direct order of a superior. Director Wolff, Superintendent Marsing, Prison Mediator Luster and Lt. Cruz all testified that the refusal of a direct order to return to work would result in dismissal. However, the testimony of Lt. Burns and Correctional Officer Birdwell was that discipline might result from such refusal, but it was not invariable that an officer would necessarily be dismissed from service.

None of the above examples of the treatment of other officers' cases involved the refusal to obey a direct order. The Court must decide whether a male officer in the same situation as plaintiff would have been dismissed and whether sex discrimination was a primary motivation in plaintiff's termination. Plaintiff bears the burden of persuasion. *United States Postal Service Bd. of Governors v. Aikens*, —— U.S. ——, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983). Both the State Hearing Officer and this Court have held that Plaintiff's termination was justified. The evidence in this case does not lead to a conclusion that plaintiff has proved, by a preponderance of the evidence, that men in similar circumstances were treated more leniently. Therefore, the Court does not find that her termina-

tion constituted an act of sex discrimination.

There is no credible evidence to indicate that plaintiff's termination was due to retaliation for her having filed grievances and complaints on account of sex discrimination in the prison system. The testimony of Mr. Wolff and Mr. Marsing is uncontradicted that at the time plaintiff was terminated they were not aware of the fact that she had made such complaints or filed proceedings before administrative bodies. Marsing had only been appointed as Superintendent of NSP on December 14, 1976, so that at the time all of these matters were concluded he had been Superintendent for only just over two weeks. There is no evidence to indicate that by reason of any previous assignment of Mr. Marsing in the Department of Prisons he would have learned of plaintiff's sex discrimination complaints.

Mr. Wolff was appointed as Director of Prisons on July 31, 1976, and had been on duty in the Nevada Department of Prisons for five months at the time of plaintiff's discharge. It appears that there had been serious problems in the prison system when he was hired. In September and October of 1976 there were riots and disturbances at NSP and on October 10, 1976, in the course of a very serious race riot, two inmates were killed. NSP was placed in a state of lockdown through the fall and by the end of December 1976 these severe restrictions were being lifted only gradually. Conditions appear to have continued fairly tense in December of 1976 and a partial lockdown remained in effect.

Both Director Wolff and Superintendent Marsing obviously had their hands full with security in the prison and it is credible to believe that they were not personally familiar with plaintiff's personnel records or that she had filed the discrimination complaints mentioned. It must be concluded, that the preponderance of the credible evidence is that Mr. Wolff and Mr. Marsing did not know of plaintiff's record in the discrimination areas and that her termina-

tion was not a matter of retaliation for having filed the complaints.

Before trial, plaintiff dismissed her complaint against eighteen defendants who had been sued as individuals and in their official capacities as employees of DOP. As a result, only DOP, Director Wolff and·Superintendent Marsing came to trial. The latter two defendants were named as individuals as well as in their official capacities.

■■■ The Eleventh Amendment bars a suit for damages against a state and its agencies and instrumentalities in federal court unless the state has consented thereto. *Jackson v. Hayakawa,* 682 F.2d 1344, 1349 (9th Cir.1982). The same constitutional immunity extends to state officers sued in their official capacities, because such actions are, in essence, against the governmental entity of which the officers are agents. *Los Angeles Branch NAACP v. Los Angeles Unified School Dist.,* 714 F.2d 946, 952 (9th Cir.1983). Nevada has not consented to such suits. *Production & Leasing, Ltd. v. Hotel Conquistador,* 709 F.2d 21 (9th Cir.1983). Nevertheless, the Eleventh Amendment does not bar an action against state officers in their official capacities if the plaintiff seeks only a declaratory judgment or injunctive relief. *Los Angeles Branch NAACP, supra* at 952.

■■ 42 U.S.C. § 1983 does not abrogate the Eleventh Amendment immunity of a state. *O'Connor v. State of Nevada,* 686 F.2d 749, 750 (9th Cir.1982). However, Congress may limit it, as it has in Title VII, where it provides for reinstatement, back pay and other forms of equitable relief against governments and governmental agencies. *See* 42 U.S.C. § 2000e–5(g); 42 U.S.C. § 2000e(a); *Fitzpatrick v. Bitzer,* 427 U.S. 445, 456–7, 96 S.Ct. 2666, 2671–72, 49 L.Ed.2d 614 (1976). Also, a suit against a state official in his individual capacity is not considered a suit against the state where the challenged actions of the official are beyond the authority granted him as such official. *Capitol Industries-EMI, Inc. v. Bennett,* 681 F.2d 1107, 1120 (9th Cir.1982). Certainly the Director of the Nevada prison system and the Superintendent of its maximum security prison don't have authority to discriminate against employees on the basis of sex.

Plaintiff herein has sought declaratory and injunctive relief, as well as damages, for violation of Title VII and § 1983. Jurisdiction is alleged under 28 U.S.C. §§ 1331, 1343, 2201 and 2202. As discussed above, plaintiff may not obtain reinstatement or back pay under Title VII, because the Court has decided on the merits that plaintiff's termination was justified. Damages may not be awarded against defendants Wolff and Marsing, as individuals, because of the termination for the same reason. The prior acts of discrimination against plaintiff may not be remedied by damages awards against them because they did not participate in those acts or cause them. *See Harris v. City of Roseburg,* 664 F.2d 1121, 1125 (9th Cir.1981). If the proper defendants, i.e., the individuals who participated in or caused the acts of discrimination against plaintiff, were before the Court, monetary damages could well be appropriate.

■■ Employment discrimination based on sex is, in effect, a class action. *See E.E.O.C. v. General Tel. Co. of Northwest,* 599 F.2d 322, 327 (9th Cir.1979); *Gay v. Waiters' and Dairy Lunchmen's Union,* 549 F.2d 1330, 1333 (9th Cir.1977). The evidence in this case and the Pretrial Order indicate an actual controversy as to whether the treatment of plaintiff constituted sex discrimination. Nor is there reasonable assurance that the same or similar conduct will not be repeated against female correctional officers if this Court fails to specifically label those acts as being in violation of Title VII. Governmental agencies are included within the definition of "person" against whom remedies may be imposed for unlawful (discriminatory) employment practices. 42 U.S.C. § 2000e–2(a). DOP has the authority and duty to assure that the discriminatory practices will not be revived. Declaratory relief is appropriate here. *See Fisher v. Dillard*

*University*, 499 F.Supp. 525, 536 (E.D.La. 1980); *Marchwinsky v. Oliver Tyrone Corp.*, 461 F.Supp. 160, 173 (W.D.Pa.1978). Because corrective changes in procedure have been effected, however, no injunctive relief will be granted.

Judgment in accordance with the foregoing shall be prepared by the Court forthwith.

This Memorandum Decision and Order shall constitute the Court's findings of fact and conclusions of law.